IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-20359
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONNIE LAMONT BLOUNT;
GAYLIN TEROD JOHNSON,

Defendants-Appellants.
_____

Appeals from the United States District Court for the
Southern District of Texas, Houston
_____
September 22, 1997

Before POLITZ, Chief Judge, and KING, GARWOOD, JOLLY, HIGGINBOTHAM,
DAVIS, JONES, SMITH, DUHÉ, WIENER,* BARKSDALE, EMILIO M. GARZA,
DeMOSS, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

A divided panel of this court concluded that the defendants'

motion to suppress evidence in this drug trafficking and firearms

case should have been granted by the district court. The panel

therefore reversed the convictions of Donnie Lamont Blount and

Gaylin Terod Johnson, over the dissent of one panel member. United

States v. Blount, 98 F.3d 1489 (5th Cir. 1996), reh'g en banc

granted, 104 F.3d 58 (5th Cir. 1997). We voted to rehear the case

en banc, principally to address the application of the Supreme

_____

*Judge Wiener concurs only in Part IV.A of the majority opinion.

Court's decision in <u>Illinois v. Gates</u>, 462 U.S. 213, 103 S.Ct. 2317 (1983), to statements made by crime scene bystanders who are ordinary citizens with knowledge of specific criminal activity. We conclude that the officers' initial warrantless entry into the residence was justified by exigent circumstances, that the affidavit for the search warrant was supported by probable cause, and that the district court therefore properly denied the motion to suppress. We affirm Blount and Johnson's convictions on the drug trafficking charges. We agree with the unanimous panel, however, that the evidence was insufficient to support Blount's firearms convictions, and we reverse and render a judgment of acquittal on those counts.[1]

I

On September 13, 1994, Officer Alan Weston of the Houston Police Department's Violent Gang Task Force received a tip from a confidential informant. The informant stated that he had observed the sale of crack cocaine in a house located at 3717 Campbell Street, in Houston's Fifth Ward district, an area with a high rate of gang-related drug crimes. The informant did not know the name of the suspect who sold the drugs, but provided Weston with a general description; the informant also told Weston that the

---

[1]Blount argues that the evidence was insufficient to sustain his convictions on the firearms counts under the Supreme Court's decision in <u>Bailey v. United States</u>, ___ U.S. ___, 116 S.Ct. 501 (1995). The government now concedes that the evidence was insufficient under <u>Bailey</u>.

suspect had a "large, blue steel pistol" lying on the couch beside him.  The informant further stated that the house in question was being used as a crack house by the Fifth Ward Posse.  Officer Weston was well aware that the Fifth Ward Posse was a violent criminal street gang.  The informant reported that he had seen several members of that gang at 3717 Campbell.

Weston performed a computer check on 3717 Campbell.  He discovered that two months previously, an aggravated sexual assault with a firearm had been reported at that address.  The report named "Ricky" and "Lamont" as suspects.  On the basis of the detailed information provided by the informant, Weston went before a magistrate judge and obtained a search warrant for the residence at 3717 Campbell.  The warrant also authorized the arrest of the unknown black male suspect.  The defendants do not contest the validity of this warrant.

After obtaining the warrant, HPD officers made a "tentative ID" of the suspect as one Richard J. Thomas, based upon further research that disclosed that (1) Thomas had previously lived down the street from 3717 Campbell, (2) Thomas was known as "Ricky" and matched the physical description given by the informant, and (3) Thomas had a felony record.

At around 6:15 a.m. on September 15, as many as twelve officers from the HPD and the Bureau of Alcohol, Tobacco and Firearms raided the house at 3717.  The officers were dressed in official HPD and ATF raid gear, with patches identifying them as

3

law enforcement officials.  The officers announced themselves loudly and then immediately rammed the front door of the house to gain entry.  A suspect matching Thomas' description escaped through a rear side door, while officers stationed at the rear attempted to fend off a pit bull dog in the back yard.  The suspect escaped over a fence to the north, and the officers lost sight of him.

Inside the house, the officers found crack cocaine, cash and a handgun.  It appeared that no one actually lived in the house, and the characteristics of the house suggested to the officers that it was being used as a "smoke house," where small retail amounts of crack cocaine were sold directly to users.[2]  The defendants do not contest the validity of this search.

Although some of the agents departed after they were unable to locate the fugitive suspect, Officer Weston and ATF agents Brown and Gary continued to search.  Approximately fifteen to twenty minutes after the raid, the officers noticed Ms. Dorothy Cooksey outside her house.  Cooksey appeared agitated.  Although Cooksey at first indicated that she saw nothing, when Weston pressed her she explained that several minutes earlier "Ricky" had attempted to force his way into her home in order to hide from police.

---

[2]The officers' extensive experience with criminal drug operations suggested to them that there must be a second house involved in the operation: a "stash house" where the bulk of the cocaine supply is kept under guard, and where wholesale amounts might be sold to street pushers.

4

Cooksey identified "Ricky" as Richard J. Thomas from the photo carried by Officer Brown; Cooksey said that she knew and feared Thomas, and did not want her name used. She told the officers that Thomas would "end up" at the house on the corner of Bleker and Campbell, which was where Thomas lived, and where he, "Lamont with the Afro" and others "sold dope." Cooksey stated that the house was a known drug house. The house on the corner to which Cooksey directed the officers was 2302 Bleker Street, and was directly adjacent to the house at 3717 Campbell. Ms. Cooksey lived at 2312½ Bleker, just two houses north of 2302 Bleker.

The remaining officers proceeded to 2302 Bleker. Officer Weston went to the rear of the house while the other officers pounded on the front door, announcing themselves as police and indicating that they needed to speak to the residents. The officers at the front heard one person say "who is it?" and then heard commotion and movement from inside the house. Meanwhile, Officer Weston peered through a four-inch gap in a boarded-over window at the rear of the house; inside Weston observed a black male with an "Afro" style haircut fiddling with the lock on a closet.

The officers continued to knock. After ten or fifteen minutes of knocking and demands by the police, one of the residents called 9-1-1 to report a burglary in progress. Within minutes, marked HPD patrol cars arrived at the scene. After discussing the situation with the new arrivals, Officer Brown and a uniformed patrol officer

approached the front door.  Defendant Blount, who had an "Afro" haircut, defendant Johnson, and Otis Green, a minor, came out of the house.  Blount, Johnson, and Green were all dressed in what Weston described as typical gang-style clothing.  The three were immediately patted down, handcuffed and detained on the porch. Blount tried to explain that he had not opened the door because he had been smoking marijuana in a cigar.

The officers then made a "protective sweep" to determine whether Thomas or anyone else was hiding in the house.  The officers did not obtain permission, but simply entered through the open front door.  The officers did not find Thomas, but they observed a razor blade with a white powdery residue in plain view on the kitchen counter.  The residue field-tested positive for cocaine.

At this point, the officers exited the house, discussed what to do, and decided to get a search warrant for the house.  They thus decided to maintain custody of the house and the detainees while a search warrant was obtained.  The detainees were read their Miranda rights after the sweep.  Weston prepared an affidavit, describing the escape of the suspect from 3717 Campbell, his conversation with Ms. Cooksey, and the events that occurred at 2302 Bleker, including a statement that cocaine residue was found during the sweep of 2302 Bleker.

The affidavit was submitted to the same magistrate judge who, two days earlier, had authorized the search of 3717 Campbell.  The

magistrate judge issued a search warrant and an arrest warrant for Blount and other persons in control of illegal drugs at the house. During the second, more thorough search of 2302 Bleker, the officers found crack cocaine in wholesale quantities, cash and several firearms, one with a silencer.  Some of the drugs and firearms were found in the locked closet at which Weston had observed Blount before the sweep; a .38 caliber revolver bearing Blount's fingerprints was found on top of a television stand in the living room.  After the search was executed, Blount and Johnson were formally arrested.

## II

Blount and Johnson were indicted in federal district court for the Southern District of Texas for conspiracy to possess with intent to distribute 50 grams or more of cocaine, in violation of 21 U.S.C. § 846 (Count 1); aiding and abetting such possession, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2); using or carrying a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1) (Count 3); and using or carrying a firearm equipped with a firearm silencer in relation to a drug trafficking offense, in violation of § 924(c)(1) (Count 4).

Blount filed a pre-trial motion to suppress the fruits of an illegal search, which Johnson joined.  Blount and Johnson alleged that they were illegally arrested without probable cause, and that the initial, warrantless sweep of 2302 Bleker was also an illegal

search.  Blount sought suppression of his statement that he had been smoking marijuana, and both defendants sought to suppress the evidence found during the initial sweep and the subsequent execution of the search warrant for 2302 Bleker.

The district court held a pre-trial evidentiary hearing on the motion to suppress.  The court found that Officer Weston's peering through the back window was not an unconstitutional search because Weston was legitimately in the back yard to ensure that the suspect they were chasing did not again escape.  The court further found that, at the time the defendants were handcuffed and detained, the officers had probable cause to arrest them for harboring a fugitive and for possession of illegal narcotics, and that the initial sweep of the Bleker Street house was a proper protective sweep.  Alternatively, the court found that the officers' actions were justified by exigent circumstances.

Following trial before a jury, Blount and Johnson were both convicted on the drug trafficking counts (Counts 1 and 2).  Blount was convicted on the firearms counts, but Johnson was found not guilty (Counts 3 and 4).  Both defendants appealed.  A divided panel of this court reversed the district court's denial of the motion to suppress, and vacated the defendants' convictions on Counts 1 and 2.  The panel agreed that insufficient evidence supported Blount's convictions on Counts 3 and 4.  We determined to rehear the appeal *en banc*.  United States v. Blount, 104 F.3d 58 (5th Cir. 1997).

Blount and Johnson contend that the evidence from 2302 Bleker should have been suppressed because the police officers' initial "protective sweep" into 2302 Bleker was unconstitutional, and therefore the subsequent search warrant was invalid as it was based upon an affidavit containing evidence obtained during the illegal first search.

The government responds first that the officers' initial sweep into the Bleker Street house was justified by exigent circumstances, including the "hot pursuit" of a fleeing felon, the danger that contraband or other evidence would be destroyed, and the danger to the officers and bystanders who had begun to gather near the house. Second, the government argues that the initial, brief search of 2302 Bleker was a lawful protective sweep incident to arrest.

In making their various arguments, the defendants strenuously dispute the officers' reliance on the statements made at the scene by the neighbor, Ms. Cooksey. Blount and Johnson argue that the information received from Cooksey cannot form the basis of a finding of probable cause to believe drugs were being sold from 2302 Bleker Street. They insist that Cooksey's statements cannot be considered reliable because she is an "unnamed, unknown, untested, and unproven" informant. They argue that the police were required to first set up surveillance on 2302 Bleker to determine whether the information provided by Cooksey could be considered

reliable. Blount and Johnson insist that under the Supreme Court's decision in Gates, tips such as Ms. Cooksey's must be "corroborated by independent police work" before they can form the basis of probable cause. See Gates, 462 U.S. at 241-246, 103 S.Ct. at 2334-2336.

The government counters that "independent corroboration" of Cooksey's information was not required under the circumstances of this case. Principally, the government argues that as an "average citizen," rather than an anonymous tipster as in Gates, the information that police received from Ms. Cooksey may legitimately be presumed credible. The government cites a variety of cases in which courts have held that "citizen informants," "identified bystanders," victims and crime scene witnesses may generally be presumed credible by police in a way that professional informants are not.

IV

As we have earlier suggested, we elected to rehear this case *en banc* in order to explain that the "totality of the circumstances" standard announced in Gates does not impose a requirement of corroboration in all cases. In this context, we iterate our previous authority and hold that, absent specific reasons for police to doubt his or her truthfulness, an ordinary citizen, who provides information to police at a crime scene or during an ongoing investigation, may be presumed credible without

11

subsequent corroboration.  We turn now to review the meaning of Gates as it relates to the case before us today.

A

Gates represents a relaxation of the formalities required for support of a search warrant.  Before the Supreme Court's decision in Gates, the federal courts generally applied a somewhat rigid "two-pronged" test to determine whether the statements of an informant could establish probable cause for a search warrant to issue.  Under the test derived from Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584 (1969), reviewing courts required that the warrant affidavit demonstrate both the informant's basis of knowledge and offer some indication of the informant's credibility or the reliability of the information offered.  In Gates, the Supreme Court observed that the "two-pronged" approach had become unduly rigid in its application, and reiterated that a simple "totality of the circumstances" test was appropriate for probable cause determinations.  462 U.S. at 230-231, 103 S.Ct. at 2328.

Gates concerned a narcotics investigation prompted by an anonymous tip.  Police received an unsolicited, unsigned letter stating that Sue and Lance Gates were involved in selling drugs. The letter specified drug-related transactions that would occur on a particular date.  Although police had no prior knowledge of the Gateses, they investigated the tip.  The police did not observe either Sue or Lance Gates with drugs or known dealers, but they did

12

observe that the unusual facts predicted by the letter--that Sue Gates would drive a car from Illinois to Florida and fly home while Lance Gates would fly to Florida and drive the car home--were accurate. Upon that basis, the police obtained a search warrant for the car and for the couple's home.

The Supreme Court suggested that, standing alone, the *anonymous* tip would not be sufficient for a finding of probable cause. However, the Court cited "the value of corroboration of details of an informant's tip by independent police work." Id. at 241. The Court concluded that because the informant's tip concerning the Gateses had been corroborated by the officers' investigation--even though no illegality had been observed-- probable cause was established under the totality of the circumstances. Id. at 246, 103 S.Ct. at 2334.

Gates states that probable cause is a "fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules," Id. at 232, 103 S.Ct. at 2329. Blount and Johnson argue, nonetheless, that Gates represents a requirement that the statements of informants be corroborated by subsequent, independent police investigation before they may be considered sufficiently reliable to establish probable cause. Yet Gates itself rejects this argument, noting that "if an unquestionably honest citizen comes forward with a report of criminal activity--which if fabricated would subject him to criminal liability--we have found rigorous scrutiny of the basis of his knowledge unnecessary." Id.

13

at 233-234, 103 S.Ct. at 2330 (citing Adams v. Williams, 407 U.S. 143, 146-147, 92 S.Ct. 1921, 1923-1924 (1972)).  Similarly, in United States v. Fooladi, 703 F.2d 180 (5th Cir. 1983), a pre-Gates decision, Judge Rubin of this court noted that "when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case."  Id. at 183 (quoting 1 W. LaFave, Search & Seizure, § 3.4(a), at 592 (1978)).  It cannot be said that Fooladi, which was decided under the more stringent requirements of Aguilar and Spinelli, does not remain valid after Gates; in fact, the common-sense approach adopted by the Supreme Court in Gates simply strengthens the position adopted in Fooladi.

There is no set requirement that all tips be corroborated by subsequent police investigation in order to be considered credible. Whether subsequent corroboration is necessary must be determined in the light of the totality of the circumstances presented by the particular set of facts.  We conclude that under the totality of the circumstances in this case, Ms. Cooksey's statements provided the police with probable cause to believe that illegal narcotics would be found in 2302 Bleker.

When the police first noticed Ms. Cooksey, they had already amassed a substantial amount of information from their early-morning raid at 3717 Campbell.  The officers knew that a black male, tentatively identified as Ricky Thomas, had been selling

14

crack cocaine from 3717 Campbell. Officer Weston testified at the suppression hearing that 3717 Campbell matched the description of a "smoke house," used only to sell small retail amounts of crack cocaine directly to users, some of whom may be permitted to remain at the house to smoke the cocaine. These officers had extensive experience with drug operations. Based on that experience, the officers knew that it was probable that there would be a more heavily-guarded "stash house" nearby, where the bulk of drugs and cash were kept, and from which the dealers might sell crack cocaine in wholesale amounts to street dealers. The officers expected other individuals, probably gang members with Thomas, to be involved in the operation. The officers also believed that Thomas and someone named "Lamont" had committed an aggravated sexual assault with a firearm at 3717 Campbell two months before the raid.

The information that Ms. Cooksey provided to the officers "fit" with what they already knew. From the picture carried by one of the officers, Cooksey confirmed that their suspect, whom she knew as "Ricky," was Richard J. Thomas. Cooksey indicated that Ricky did not live at 3717 Campbell, but at 2302 Bleker. She confirmed that Thomas was involved in selling drugs, and also connected Thomas with a "Lamont" through her statement that "Lamont with the Afro" and others sold drugs from 2302 Bleker. Furthermore, Cooksey identified 2302 Bleker as a known drug house in her neighborhood.

15

The officers had no reason to disbelieve Ms. Cooksey, or to question her motives or credibility. Cooksey was *not* an anonymous tipster or a paid informant. Although the warrant affidavit does not give Cooksey's *name*, the affidavit states that the information was solicited from a female who (1) lived at 2312½ Bleker, two houses away from the subject house, (2) knew and feared the fugitive Ricky Thomas, and (3) had observed Thomas attempt to kick in her door in an effort to hide from police. This information adequately identifies Ms. Cooksey as a citizen providing information during a crime scene investigation in her immediate vicinity.

Unlike the anonymous tipster in <u>Gates</u>, whose unsolicited information concerned people unknown to police, Cooksey's statements were solicited by police after they observed her outside her house on the morning in question. Cooksey's statements fit into the *end* of an ongoing investigation, rather than prompting the beginning of a new one. The immediacy of the investigation, with a fleeing felon on the loose, is also a relevant consideration. Under the circumstances, "independent police corroboration" of the information given by Ms. Cooksey was not required. We conclude that under <u>Gates</u>, and under our specific precedent of <u>Fooladi</u>, Cooksey's statements provided the police with probable cause to believe that (1) Ricky Thomas might be hiding in 2302 Bleker, and (2) illegal drugs would be found at 2302 Bleker.

16

The government argues that Cooksey's statements, combined with the information that the officers had already obtained, established exigent circumstances justifying the officers' initial entry into 2302 Bleker. Although a warrantless entry into a home is presumptively unreasonable, entry may be justified by exigent circumstances. United States v. Rico, 51 F.3d 495, 501 (5th Cir.), cert. denied, ___ U.S. ___, 116 S.Ct. 220 (1995) (citing United States v. Richard, 994 F.2d 244, 247 (5th Cir. 1993)). The government bears the burden of proving that an exigency existed. Id. (citing United States v. Thompson, 700 F.2d 944, 946 (5th Cir. 1983)). In this case, the district court specifically found that exigent circumstances existed. This determination is reviewed only for clear error. United States v. Howard, 106 F.3d 70, 74 (5th Cir. 1997) (citing Richard, 994 F.2d at 248). We conclude that the district court did not clearly err.[3]

Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry. Exigent circumstances generally exist where there is a risk that the officers or innocent bystanders will be

---

[3]Because we affirm the district court's denial of the motion to suppress on the grounds that exigent circumstances existed, we do not consider the government's argument that the officers' initial entry into the house was a proper sweep incident to a lawful arrest. Thus, it is unnecessary to reach the question whether there was probable cause to arrest Blount and Johnson when they exited 2302 Bleker.

endangered, or that evidence will be destroyed.  In <u>Rico</u>, we identified a *non-exhaustive* list of factors that may be considered in determining whether exigent circumstances existed:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant;
>
> (2) the reasonable belief that contraband is about to be removed;
>
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
>
> (4) information indicating that the possessors of the contraband are aware that the police are on their trail; and
>
> (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

<u>Id.</u> at 501 (<u>citing</u> <u>Richard</u>, 994 F.2d at 248) (internal brackets and quotation marks omitted).

The exigent circumstances analysis focuses upon the reasonableness of the officers' investigative tactics leading up to the warrantless entry.  Our purpose is *not* to examine each act in isolation and inquire whether the officers *could* have acted differently.  If "reasonable minds may differ" the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation.  <u>Howard</u>, 106 F.3d at 76.

In this case, the officers faced two separate, but related concerns when they first approached 2302 Bleker:  the officers were

18

attempting to apprehend and arrest Ricky Thomas, and the officers reasonably believed that a violent drug-trafficking gang, to which Thomas belonged, was operating from 2302 Bleker as its stash house.

Blount and Johnson argue that the officers were required to set up surveillance of the house and obtain a warrant; they contend that any exigency that existed was "manufactured" by the officers when they approached the front door of 2302 Bleker. It is true that the prosecution may not rely upon an exigency that the police themselves created through unreasonable investigatory tactics. Richard, 994 F.2d at 248. This, however, is not such a case.

As we have already concluded, Ms. Cooksey's statements, combined with the information the officers had already obtained, gave the officers probable cause to believe both that Thomas could be hiding in 2302 Bleker and that the other residents of 2302 Bleker were engaged in drug trafficking. This fast-moving and unpredictable scene in a tough neighborhood infected by a violent drug-trafficking gang was simply not a case where the officers could safely set up surveillance while they awaited a search warrant.

First, the officers were continuing an immediate search for a fleeing felon who had already escaped once from a large group of officers. The officers had confirmed that Thomas was engaged in the sale of crack cocaine, and he was a suspect in an armed sexual assault. The officers reasonably believed that Thomas was armed, dangerous, and would attempt to evade capture. It would have been

19

virtually impossible for the officers to *covertly* secure 2302 Bleker against Thomas' escape.

Moreover, Thomas was not the officers' sole concern. The officers reasonably believed that 3717 Campbell and 2302 Bleker were two houses being employed by a violent criminal street gang in its cocaine trafficking operation. The house at 2302 Bleker, the officers believed, was the "stash" house from which the conspiracy operated. Considering that 2302 Bleker was a mere fifteen feet away from 3717 Campbell, where as many as twelve law enforcement officers had executed an early morning raid, it would be unreasonable to suppose that the residents of 2302 Bleker were *not* aware of the officers' presence.[4]

Under the circumstances, the officers' decision to immediately approach 2302 Bleker and ask to speak to the residents was reasonable. They were looking for Ricky who might well have been in the house. They had been told by a neighbor that it was his residence, and that at some point he would land there. They had been told by that neighbor that drugs were sold there. They knew that Ricky sold drugs. They had reason to believe that members of a violent gang were also involved. They had reason to believe that 2302 Bleker was the "stash house" for the drug operation they had

---

[4]This situation is entirely different from that in <u>Richard</u>, where we held that the government manufactured an exigency by approaching a hotel room without any reason to believe that the occupants were aware that they might be under surveillance. <u>Richard</u>, 944 F.2d at 249.

20

earlier uncovered. The fact that the residents refused to come to the door or to communicate with the officers but were heard moving around within the house added to an intense and volatile situation and--importantly--to the likelihood that significant evidence was being destroyed. We have previously observed that the destruction of narcotics is a "characteristic behavior" of those engaged in drug trafficking. Thompson, 700 F.2d at 948.

The situation also remained potentially explosive from the officers' reasonable point of view. Not only are firearms "tools of the trade" in illegal drug trafficking, Howard, 106 F.3d at 75, but the fugitive member of the drug conspiracy had previously been observed with a handgun, and a firearm had been found in the raid on the first house.[5]

These concerns were not eliminated at the point when the three residents of 2302 Bleker exited the house. As far as the officers knew at the time, Thomas and perhaps others involved in the drug trafficking operation might still be hiding in the house, barricading themselves against an arrest. Furthermore, any individuals who remained inside might still be destroying evidence. If so, a sweep through the house was the officers' only opportunity to recover remnants of attempts at drug destruction, which would

---

[5]Although the firearm found at 3717 Campbell may well have been the handgun observed by the confidential informant, it was possible--if not likely--that the fleeing suspect had access to more than one firearm. Furthermore, gang-related drug trafficking operations predictably involve firearms.

likely be lost during the intervening time required to obtain and execute a search warrant. Importantly, several onlookers had begun to gather near the house, who would be endangered if a barricade and shoot-out were allowed to develop. Against the backdrop of these facts, the officers had to decide whether to make an entry and fully secure the crime scene or to "pull out," leaving outside security surrounding the house and delay further action until a warrant application could be prepared and a warrant obtained. The decision that the officers made was not unreasonable. To hold otherwise would ignore the interplay between the officers' continuing efforts to apprehend Thomas and the officers' reasonable belief that 2302 Bleker was a "stash" house--connected with 3717 Campbell that the officers had earlier raided--where drugs were being kept and sold by dangerous gang members in a violence-prone section of the city.

Finally, we underscore a point that cannot be brushed aside: our standard of review is highly deferential. Under the circumstances, we conclude that the district court was not clearly erroneous in its finding that exigent circumstances justified the officers' initial entry into 2302 Bleker.[6]

---

[6]Because we have concluded that exigent circumstances justified the officers' protective sweep into 2302 Bleker, during which cocaine residue and items used in the preparation of crack cocaine were discovered in plain view, we do not consider the appellants' challenges to Officer Weston's alleged "search" through the window at the rear of the house and to the use of Blount's statement that he did not open the door or respond to the officers' requests because he had been smoking marijuana. For the purposes

22

Thus, we sum up: Based upon Cooksey's statements and the information that the officers had already amassed, the officers had probable cause to believe that Thomas might be hiding in 2302 Bleker, and that drugs or other contraband would be found there. We further have concluded that the officers' investigative tactics were not unreasonable, and that the district court's finding that exigent circumstances existed was not clearly erroneous. Consequently, the evidence referred to in the affidavit was properly obtained and supported a finding of probable cause. The search warrant was therefore valid, and the district court correctly denied Blount and Johnson's motion to suppress the evidence found at 2302 Bleker.

---

of this opinion, we therefore excise this evidence from the affidavit supporting the search warrant. We conclude that the evidence remaining in the affidavit, in particular the cocaine residue that was properly observed during the protective sweep, was more than sufficient to provide probable cause for the search warrant to issue. It is also clear that, given the officers' discovery of cocaine residue, no reasonable factfinder could conclude that either Weston's observing Blount through the window or Blount's statement prompted the officers to seek the search warrant. Therefore, there is no need to remand the case under Murray v. United States, 487 U.S. 533, 542, 108 S.Ct. 2529, 2536 (1988) (remanding case for district court to determine whether officers' unconstitutional search of warehouse was "confirmatory search" that prompted officers' decision to later obtain a warrant to search the warehouse legally). Finally, to the extent that any evidence of Blount's statement or of Weston's challenged "search" through the window was admitted at trial, any error in admitting the evidence was harmless beyond a reasonable doubt. It is inconceivable that this evidence contributed in any material way to the defendants' cocaine-trafficking convictions, which were supported by overwhelming evidence obtained during the execution of the search warrant for 2302 Bleker.

Blount and Johnson's convictions on Counts 1 and 2 are therefore AFFIRMED. Blount's convictions on Counts 3 and 4 for drug-related firearms violations are REVERSED, and a judgment of acquittal is RENDERED on those counts.

AFFIRMED in part; REVERSED in part; and RENDERED in part.

ENDRECORD

POLITZ, Chief Judge, with whom WIENER and DENNIS, Circuit Judges, join, dissenting:

The majority opinion notes that the court determined to rehear this case *en banc* to address the application of **Illinois v. Gates**[7] to statements made by ordinary citizens who are crime scene bystanders with knowledge of specific criminal activity. After performing that **Gates** analysis, however, the majority opinion further concludes that exigent circumstances justified the warrantless entry into 2302 Bleker Street. Persuaded that the district court's rulings on the existence of probable cause and exigent circumstances were clearly erroneous, I must dissent.

After evaluating the totality of the circumstances, as **Gates** requires, the majority concludes that Dorothy Cooksey's statement to the police provided probable cause for the officers to believe (1) that illegal narcotics would be found at 2302 Bleker Street and (2) that Ricky Thomas was hiding there. Noting that her statement "fit" with information the officers already had, the majority identifies several things that the government "knew" from their early morning raid at 3717 Campbell. The officers knew that a black male, "tentatively identified as Ricky Thomas," had been selling narcotics from 3717 Campbell. They suspected, based on what they found in the raid, that a heavily-guarded "stash house" would be located nearby. They expected that

_____

[7]462 U.S. 213 (1983).

25

"other individuals, probably gang members," would be involved in selling narcotics with the suspected Thomas. Finally, they believed that their suspect and someone named "Lamont" had committed an aggravated sexual assault with a firearm at 3717 Campbell two months earlier. Cooksey identified the man in the photo the police showed her as Richard J. Thomas and told them that he ultimately would return to his residence at 2302 Bleker, which she said was a "known drug house."

The majority maintains that there was no reason for the officers to disbelieve Cooksey or to question her motives or credibility, holding that "absent specific reasons for police to doubt his or her truthfulness, an ordinary citizen, who provides information to police at a crime scene or during an ongoing investigation, may be presumed credible without subsequent corroboration." The majority ignores the fact that the record contains different versions of what Cooksey told the police. It also sidesteps the fact that although Cooksey lived two houses north of 2302 Bleker, she could not see that house from her own and she did not tell the police that she had actually seen Ricky go there. Further, there is more than a mere measure of doubt in suggesting that it was reasonable for the police to assume that Thomas, if there, would continue to hide in the house which was only fifteen feet from the site of the raid at 3717 Campbell.

The supporting affidavit for the search warrant included other information of questionable validity. The majority opinion opts not to address whether Officer Weston conducted an unconstitutional search by peeking through the rear window of 2302 Bleker. Although a piece of plywood covered most of the opening, by leaning

26

against the house and pressing his face within inches of a small gap in the plywood, Weston was able to see inside. In his affidavit he stated that he "observed the suspect Donnie Lamont Blount moving around the room and [he] appeared to be hiding something." The police later found cocaine, drug paraphernalia, and firearms in a locked closet.

The district court found that Weston's actions did not constitute an illegal search because he was in the backyard to seal an avenue of escape, not to peer into the window. This factual finding regarding Weston's <u>subjective</u> state of mind is inapposite to the question presented, *i.e.*, whether Weston's <u>objective</u> conduct violated the defendants' legitimate expectation of privacy in the curtilage of their home.[8] When a police officer walks into the partially fenced back yard of a residential dwelling, using a passage not open to the general public, and places his face within inches of a small opening in an almost completely covered rear window to look into the house and at the inhabitants, I am persuaded beyond peradventure that the officer has performed a "search" within the meaning of the fourth amendment. The majority claims that to the extent any of the evidence from this "search" was admitted at trial, any error was harmless because there was overwhelming evidence to support the convictions. My read of the record convinces otherwise. In the instant case, Weston's actions provided

---

[8]*See* **Whren v. United States**, 116 S.Ct. 1769 (1996) (proper focus of fourth amendment inquiry is the objective conduct, not the subjective intent, of the police officer); **United States v. Causey**, 834 F.2d 1179 (5th Cir. 1987) (en banc) (same).

essential information for obtaining the search warrant. I cannot agree that the error was harmless.

The majority purports to excise Weston's observations from the affidavit supporting the search warrant and concludes that the remaining evidence sufficed to provide probable cause. Some of the critical remaining evidence, including the presence of cocaine residue in plain view in the kitchen, was obtained in the protective sweep the officers conducted after Blount and Johnson opened the door to the uniformed officers they had summoned by dialing 911. The government contends that the officers' entry was a proper sweep incident to a lawful arrest. The majority justifies the search by concluding that exigent circumstances existed in doing so, ignoring the difficult issue of probable cause to arrest Blount and Johnson. I find their analysis flawed in several respects.

If Cooksey's statements are given less than dispositive weight in the calculation and tainted evidence is excluded, probable cause is wanting for either a search of 2302 Bleker or the arrest of Blount and Johnson. The district court found that the police had probable cause to arrest the defendants for the crimes of harboring a fugitive (Thomas) and possessing contraband.[9] A precondition to the crime of harboring a fugitive under

---

[9]My review of the record persuades that this justification for the arrests only evolved during the defendants' trial, with supporting testimony from Weston elicited by the leading questions from the prosecutor. Our en banc holding in **Causey**, however, requires that we ignore this pretextual submission and confine our examination to the propriety of the officers' objective actions. **United States v. Flores**, 63 F.3d 1342 (5th Cir. 1995).

federal law is the issuance of an arrest warrant.[10] The police were well aware that there was no extant arrest warrant for Thomas at the time Blount and Johnson were arrested. The analogous Texas statute requires knowledge of the fugitive's status and some affirmative action hindering police access to a felon.[11] The police in this case simply arrested the defendants on first sight, inquiring about Thomas's whereabouts only after the defendants had been "secured." On these facts an objectively reasonable police officer would have had <u>no</u> probable cause to arrest the defendants for harboring a fugitive. While we have extended the Supreme Court's holding in **Maryland v. Buie**[12] to permit a protective sweep ancillary to a *warrantless* arrest,[13] the fourth amendment does not sanction such a search incident to an *illegal* arrest.

Without probable cause to arrest or perform a search, the police may not enter without a warrant. Although exigent circumstances permit police to perform a warrantless search, officers may not rely on exigencies that they created through unreasonable investigatory tactics.[14] Warrantless searches are presumed to be unreasonable and the government bears the burden of proving that such a search was

---

[10]*See* 18 U.S.C. § 1071; **United States v. Zerba**, 21 F.3d 250 (8th Cir. 1994); **United States v. Lockhart**, 956 F.2d 1418 (7th Cir. 1992).

[11]Tex. Penal Code Ann. § 38.05; **Antu v. Eddy**, 914 S.W.2d 166 (Tex. App.-- San Antonio 1995).

[12]494 U.S. 325 (1990).

[13]**United States v. Mendoza-Burciaga**, 981 F.2d 192 (5th Cir. 1992).

[14]**United States v. Richard,** 994 F.2d 244 (5th Cir. 1993).

necessary.[15]  My review of  the record compels the conclusion that the district court clearly erred in finding exigent circumstances.

The majority characterizes the circumstances surrounding the search as a "fast-moving and unpredictable scene in a tough neighborhood infected by a violent drug-trafficking gang."  According to the opinion, the police were in pursuit of a "fleeing felon" and had a reasonable belief that he was "armed, dangerous, and would attempt to evade capture." The majority would have us believe that it "would have been virtually impossible to *covertly* secure 2302 Bleker" because it was reasonable to believe that the raid conducted next door at 3717 Campbell alerted the individuals inside the house to the police presence even before the officers knocked on the door. They opine that the fact that Blount and Johnson refused to answer the door and were heard moving around inside added to the likelihood that "significant evidence was being destroyed."  Further, based on the officers' experience, it was also likely that the individuals inside the house were participating with Thomas in selling narcotics and were armed.  As a result, the situation posed a significant risk to the officers and to the onlookers outside.  The majority concludes that it was not possible for the officers to set up surveillance while waiting on a warrant.

The record demonstrates otherwise.  To determine whether exigent circumstances were manufactured by the police, we must "review the entirety of the

---

[15]**United States v. Rico**, 51 F.3d 495 (5th Cir.), *cert. denied*, 116 S. Ct. 220 (1995).

agents' investigative tactics, particularly those leading up to the exigency alleged to have necessitated the protective sweep."[16] Considering the five factors we have identified,[17] I believe that the police could have and should have waited to obtain a warrant before entering 2302 Bleker. Contrary to the majority's version of the events, Thomas was not a "fleeing felon." At most he was a "fleeing suspected felon." Any continuous police pursuit of Thomas had ended over thirty minutes before the police approached 2302 Bleker. There is no evidence that the inhabitants of the house were aware of the police presence before the agents knocked on the door. Aside from Cooksey's broad and uncorroborated statement, there was no indication that contraband would be found in the house and certainly no evidence regarding its "ready destructibility" or the risk of its removal or destruction. While the obvious prospect of danger attends nearly every narcotics investigation, the police were unaware of any particular danger to themselves or others which might distinguish this case. For example, there was no evidence that Thomas was armed when he fled 3717 Campbell.

---

[16]**Id.** at 501.

[17]The factors are: (1) the degree of urgency involved and the time needed to obtain a warrant; (2) the existence of a reasonable belief that contraband is about to be removed or that a suspect may flee; (3) the risk of danger to police or bystanders; (4) information indicating that the suspects are aware of the police presence; and (5) the ready destructibility of any contraband present. **Richard**, 994 F.2d at 248.

None of the officers involved in the initial chase reported seeing Thomas with a firearm.[18]

The officers were in a position to call in reinforcements and seek a warrant while keeping the house under surveillance, a markedly safer and, incidentally, a constitutional course of action which would have obviated the need to brazenly confront the unknown in 2302 Bleker. In short, "[t]here was no basis, on these facts, for believing that resort to a magistrate would have created risks of a greater magnitude than those which are present in any case where the police have probable cause but delay entry pending receipt of a warrant."[19] I find no alternative to concluding that the district court's finding of exigent circumstances was clearly erroneous. All evidence obtained in the protective sweep should have been excised.

Because there was no probable cause for the warrant's issuance, all of the evidence seized pursuant to the warrant should have been suppressed. Given the substantial amount of evidence thus excluded, the error was not harmless and, accordingly, the convictions of both defendants on Counts 1 and 2 of the indictment should be vacated and remanded for further proceedings. I must respectfully dissent.

---

[18]The firearm named in the affidavit supporting the search warrant for 3717 Campbell was seized during the search. The officers' suspicion that Thomas was armed stemmed entirely from the fact that Thomas was a suspect in an aggravated sexual assault that had occurred two months earlier.

[19]**United States v. Munoz-Guerra**, 788 F.2d 295, 298 (5th Cir. 1986).