# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 13, 2010

No. 09-50067

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

BRIAN MICHAEL DAVID ROBERTS,

Defendant - Appellant

Consolidated with
No. 09-50186

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MAJOR HARRISON BOOTH,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, GARZA and PRADO, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

No. 09-50067
Consolidated with
No. 09-50186

This is a consolidated appeal by co-defendants, Brian Michael David Roberts ("Roberts") and Major Harrison Booth ("Booth"). Both men entered conditional guilty pleas to firearms violations,[1] and now appeal the denial of their motion to suppress the firearms. For the reasons set forth below, we AFFIRM.

**I**

Officers Darren Clements and Kent Spencer received a tip that some of the residents of an apartment building might be in possession of stolen items and guns. Officers Clements and Spencer went to the apartment to investigate. They spoke with the occupants of an apartment who told them that a white male known as "B" had recently attempted to sell them a laptop computer, which they believed was stolen, and that "B" was carrying a gun on his hip during the interaction. The tipsters told the officers that "B" lived in apartment 2201, pointed out a small pickup truck that "B" drove, and indicated that a black male known as "Major" also lived in the apartment with "B." The officers were also told that other people regularly stayed in the apartment with "B" and "Major." A license plate check on the truck revealed that it was registered to Brian Roberts, who had several outstanding arrest warrants for traffic offenses. Based on this information, the officers surmised that Brian Roberts was the person identified as "B."

The officers called for additional backup because they did not know how many people were in the apartment. While waiting, they observed a black man enter and exit the apartment. They did not see a white male.

---

[1] Booth pleaded guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Roberts pleaded guilty to one count of possession of a firearm by a user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). The charges were based on a 9mm handgun and a 12-gauge shotgun seized from the apartment where the men lived.

No. 09-50067
Consolidated with
No. 09-50186

Once a third officer arrived, the officers approached the apartment to arrest Roberts on the outstanding traffic warrants. Officers Clements and Spencer knocked on the door and a white man matching Roberts's description answered. Officer Spencer identified himself and stated that they were looking for Brian Roberts so they could execute arrest warrants. The man at the door said that he was Roberts. The officers asked him for identification to verify his identity before making the arrest. At that point, the officers were still at the threshold of Roberts's apartment, where they could perceive other people in the darkened room behind Roberts.

Roberts turned back into the darkened apartment to retrieve his wallet from an entertainment center. At that point, the officers stepped into the darkened apartment, and Officer Clements shined a flashlight on Roberts to maintain supervision over the suspect.

When Officer Clements pointed the light at Roberts, Clements could see a pistol magazine and several loose rounds of ammunition in plain view on the entertainment center. The officers could also see other people in the apartment. Seeing the ammunition within easy reach, the officers immediately ordered Roberts to stop walking toward the entertainment center and return to the door. Officer Spencer handcuffed Roberts. The other occupants of the apartment were moved away from the weapons and secured against one wall. The officers later retrieved the magazine and a gun that Roberts told them was under the couch.

Concerned that there might be other people and weapons in the apartment, the officers conducted a protective sweep. Officer Clements knocked at a locked bedroom door. A black male, later identified as Booth, opened the door. Officer Clements then entered the room and saw a shotgun leaning inside

3

No. 09-50067
Consolidated with
No. 09-50186

an open closet. He secured the gun and removed it from the apartment. Booth was taken into custody because he had an outstanding Georgia arrest warrant.

Roberts and Booth were indicted for federal weapons offenses. They moved to suppress the firearms seized from the apartment, claiming that the police lacked consent to enter the apartment and had no basis to perform a protective sweep. The district court denied the motion to suppress. Both men pleaded guilty conditionally, reserving their right to appeal the district court's denial of their motions to suppress.

## II

The standard of review for a "motion to suppress based on live testimony at a suppression hearing is to accept the trial court's factual findings unless clearly erroneous or influenced by an incorrect view of the law." *United States v. Outlaw*, 319 F.3d 701, 704 (5th Cir. 2003). Evidence is considered in "the light most favorable to the prevailing party." *United States v. Shelton*, 337 F.3d 529, 532 (5th Cir. 2003). The ultimate conclusion about the constitutionality of the law enforcement conduct is reviewed de novo. *Id.* This court "may affirm the district court's ruling on a motion to suppress based on any rationale supported by the record," but "where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (internal citations omitted).

Roberts and Booth contend that their Fourth Amendment rights were violated when the police executed a warrantless search of the apartment. They argue that the officers conducting the search (1) had no justification for entering the apartment; (2) had no justification for conducting a protective sweep of the apartment; and (3) did not satisfy the elements of the "plain view" doctrine that

would permit them to seize the weapons. Accordingly, they argue that the weapons seized during the search should have been suppressed.

## A

Appellants argue that because Roberts admitted his identity in response to Officer Spencer's question, the limited authority to enter a residence to effectuate an arrest warrant was not implicated.[2] Accordingly, we first consider whether the officers' entry into the apartment was valid.

The officers were reasonable in conducting a "knock and talk," which is an accepted investigatory tactic. *See, e.g.*, *United States v. Gomez-Moreno*, 479 F.3d 350, 356 (5th Cir. 2007). They approached the door, asked for Roberts so that they could execute the arrest warrants, and then requested that the person purporting to be Roberts provide identification so that they could make the arrest. The officers testified that departmental policy requires them to verify a suspect's identity before making an arrest.[3]

The Supreme Court has rejected the notion that exigent circumstances are required to justify entering an area in which a person has a protected Fourth

---

[2] Appellants also argue that the arrest warrants for traffic violations could not justify the officers' entry into the apartment. Although we have long recognized that "[p]olice armed with an arrest warrant and probable cause to believe that a suspect is at his home have the right to enter the premises to arrest him," we have not explicitly addressed whether the type of warrant matters. *See, e.g.*, United *States v. Virgil*, 444 F.3d 447, 451 (5th Cir. 2006) (citing *Payton v. New York*, 445 U.S. 573, 602–03 (1980)); *United States v. James*, 528 F.2d 999, 1017 (5th Cir. 1976). Appellants contend that only a felony (as opposed to misdemeanor) warrant is sufficient to privilege an officer's entry. We need not answer that question today, because, as discussed herein, the step into the apartment was justified to maintain control of Roberts during the arrest.

[3] There is nothing in the record to suggest that the request was unreasonable or would create exigent circumstances. Indeed, the officers had no way of knowing that the request would result in Roberts walking back into the darkened apartment. No doubt if they gave any thought to the matter at all, they reasonably would have expected that Roberts would produce identification from somewhere on his person.

No. 09-50067
Consolidated with
No. 09-50186

Amendment privacy right where the entry is effectuated to maintain control over someone being placed under arrest. *See Washington v. Chrisman*, 455 U.S. 1, 7 (1982). In *Chrisman*, a Washington State University police officer spotted a student, who appeared to be underage, carrying a half-gallon bottle of gin, and requested identification from him. *Id.* at 3. The student said his identification was in his dorm room and requested that he be allowed to retrieve it. *Id.* The officer accompanied the student to the dorm. While there, the officer identified drug paraphernalia in plain view. *Id.* at 4. He seized the contraband and arrested the student and his roommate. *Id.* The Supreme Court reversed the Washington Supreme Court, which had found that the officer was not entitled to accompany the student from the public hallway into the dorm room absent exigent circumstances. *Id.* at 6.

The Supreme Court found that exigent circumstances were not required to enter the dorm room because the arresting officers had authority to maintain custody over the arrested person.[4] *Id.* (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109–10 (1977). The Supreme Court held that "it is not 'unreasonable' under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person" because the need to "ensure his own safety—as well as the integrity of the arrest—is compelling." *Id.* at 7.

---

[4] Although the Supreme Court refers to the student as having already been placed under arrest when the officer accompanied him back to his dorm room to retrieve identification, *id.* at 6, we do not think that this characterization makes *Chrisman* any less applicable. Whether considering the suspect to be under arrest or in the process of being arrested, the facts are on all fours. In *Chrisman*, the officer suspected illegal possession of alcohol and requested identification to confirm that the student was, in fact, underage. *Id.* at 4. Likewise, the officers here had valid, outstanding arrest warrants for Roberts and requested identification to verify that the arrest was proper. In both cases, the officers moved into an area in which the suspect had a protected Fourth Amendment privacy right in order to maintain control over the suspect.

6

No. 09-50067
Consolidated with
No. 09-50186

The facts here are even stronger than in *Chrisman*. The Supreme Court found that the entry to maintain control was reasonable *even in the "absence of an affirmative indication that the . . . person might have a weapon available* or might attempt to escape." *Id.* at 6. (emphasis added). Here, the officers acted well within their authority in stepping into Roberts's apartment. Not only did they need to maintain control over their suspect, but they had affirmative information indicating the presence of weapons based on information provided by the other building residents.

Officer Spencer reasonably requested identification to verify that the suspect was who he said he was. Roberts moved into a darkened room to retrieve his identification. Based on the officers' knowledge that Roberts had been seen with a gun and their observation—before stepping into the apartment—that at least three other individuals occupied the dimly-lit room, the officers' were justified in taking a step into the apartment in order to continuously observe Roberts. "There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger." *Chrisman*, 455 U.S. at 7. Under this set of circumstances, concern for officer safety and maintaining control over the suspect justified taking a step into Roberts's apartment. "Our purpose is *not* to examine each act in isolation and inquire whether the officers *could* have acted differently." *United States v. Blount*, 123 F.3d 831, 838 (5th Cir. 1997). We are not prepared to "second-guess the judgment of experienced law enforcement officers concerning the risks" of this particular situation. *Id.* (internal quotation marks and citation omitted).

**B**

Roberts and Booth raise a second issue: whether the police were justified in conducting a protective sweep of Roberts's apartment. "'[A] 'protective sweep'

is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.'" *United States v. Gould*, 364 F.3d 578, 581 (5th Cir. 2004) (*en banc*) (quoting *Buie*, 494 U.S. at 327). The sweep may occur after the suspect has been arrested. *Buie*, 494 U.S. at 334. To be constitutionally valid, (1) "the police must not have entered (or remained in) the home illegally and their presence within it must be for a legitimate law enforcement purpose;" (2) "the protective sweep must be supported by a reasonable, articulable suspicion . . . that the area to be swept harbors an individual posing a danger to those on the scene;" (3) "the legitimate protective sweep may not be a full search but may be no more than a cursory inspection of those spaces where a person may be found;" and (4) the protective sweep "may last . . . no longer than is necessary to dispel the reasonable suspicion of danger, and . . . no longer than the police are justified in remaining on the premises." *Gould*, 364 F.3d at 587 (internal citations omitted).

The district court found that the protective sweep of the apartment was valid. Appellants argue that the sweep was unjustified because "[h]ad the police arrested Roberts when he acknowledged his identity, he would not have been in a position to harm anyone," and "[n]o reasonable person would have thought that Roberts could have caused any harm once in custody of the two armed officers who confronted him at his home." Appellants also argue that "there was no testimony that Roberts was violent;" Roberts "never resisted arrest or tried to flee and was generally cooperative with the officer;" and, that after their entry, the officers "lacked any reasonable belief or suspicion that the apartment might be harboring someone who might cause them harm."

Notwithstanding Appellants' arguments to the contrary, the requirements for a valid protective sweep were met. The officers entered the apartment

No. 09-50067
Consolidated with
No. 09-50186

pursuant to a "legitimate law enforcement purpose." *Id.* The officers were aware that Roberts had been seen with a firearm; they observed additional occupants in the darkened living room, a person other than Roberts exiting and reentering the apartment, and ammunition clips in plain view; and Roberts's told them that a pistol was under the couch. The officers "possesse[d] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer[s] in believing that the area swept [may have] harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. 327–28 (internal quotations omitted). The circumstances on which the officers could reasonably rely in determining that a protective sweep was necessary were not limited to the threat posed by Roberts, but the potential threat of any of the other occupants of apartment where weapons were clearly present. Moreover, Appellants do not argue that the sweep was anything more than "a cursory inspection of only those spaces where a person may hide." *United States v. Mata*, 517 F.3d 279, 286 (5th Cir. 2008). Nor do they argue that the sweep continued longer than necessary. *Id.* Based on these facts, the protective sweep was valid.

## C

Finally, Appellants challenge the seizure of the firearms. After establishing that the officers validly entered the apartment, the district court held that:

> (1) the items seized were either found through admission of the defendant (telling detectives there was a gun under the couch) or because they were sitting in plain view during the sweep, (2) that the incriminating nature of the guns and ammunition were immediately apparent, and (3) that the police had a lawful right of access to the guns.

9

No. 09-50067
Consolidated with
No. 09-50186

While the Fourth Amendment generally prohibits warrantless seizures, *see Buie*, 494 U.S. at 331, the "plain view" exception allows police to seize items where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was "immediately apparent;" and (4) the police had a lawful right of access to the item. *Horton v. California*, 496 U.S. 128, 136–37 (1990). "The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband. Probable cause does not require certainty." *United States v. Waldrop*, 404 F.3d 365, 369 (5th Cir. 2005) (internal quotation marks and citation omitted). "If . . . the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object," then its incriminating nature is not immediately apparent and "the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (quotations omitted).

On appeal, Appellants challenge the third prong of the plain-view doctrine, arguing that there was no reason to believe that the firearms were illegal or otherwise incriminating.[5] They contend that "there is no evidence in the record that the police knew the criminal history of anyone in the home, thus there could be no immediate apparent illegal possession of the seized evidence," and that "the facts do not support the idea that the mere presence of a gun clip and

---

[5] We note that the district court conducted its Fourth Amendment analysis of the weapons, including the gun retrieved from under the couch, under the rubric of the plain-view doctrine. It is clear that the district court was attempting to fit the search and seizure of the weapons at issue into existing legal doctrine. Nonetheless, it was error to find the gun under the couch—which was not in plain view and was retrieved based on Roberts's admission that it was located there—to be an item in plain view. However, Roberts and Booth do not challenge the plain view prong of the district court's analysis, and thus have waived the error. Accordingly, we consider only the argument that the incriminating nature of the weapons were not immediately apparent.

10

No. 09-50067
Consolidated with
No. 09-50186

ammunition on the entertainment center was illegal." Because Appellants did not argue at the suppression hearing that the incriminating nature of the firearms was not immediately apparent, our review is for plain error. *See United States v. De Jesus-Batres*, 410 F.3d 154, 159 (5th Cir. 2005) (noting that plain error review applies to arguments that a defendant fails to raise at a suppression hearing).

The weapons were illegal because they were possessed by persons who had no lawful right to possess them. However, the officers who seized the weapons did not know at the time of the seizure the criminal histories of Roberts and Booth that would make their possession of the weapons illegal. Thus, the incriminating nature of the weapons was not apparent at the moment they were seized and removed from the apartment.

Nonetheless, we think the police were justified in temporarily seizing the weapons under these circumstances. *See United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010). The officers could see four individuals in the darkened room of the apartment. When Roberts walked back into the darkened room, Officer Clements saw a pistol magazine and loose ammunition rounds on the entertainment center where Roberts was headed. At that point, the officers asked Roberts to step away from the entertainment center, and they secured the other individuals against a wall, away from the ammunition. Roberts then told the officers that there was a gun under the couch.[6] Though the officers moved

---

[6] It does not appear that the gun was immediately retrieved and removed from the house. Rather, the officers conducted a protective sweep and located Booth and another individual in a bedroom with a shotgun in plain view. Although one might question whether the better course of action would have been to immediately retrieve and secure the gun under the couch, the officers' decision to first move the occupants of the living room away from the couch and conduct a protective sweep of the remainder of the apartment was reasonable given their concern that other persons and weapons might be present.

11

No. 09-50067
Consolidated with
No. 09-50186

all of the individuals against a wall, the danger posed to the officers by the firearms did not fully dissipate. The individuals were not handcuffed or otherwise incapacitated and in the event of a scuffle could have accessed the unsecured weapons. "Common sense dictates that a firearm that could be accessed by someone at the scene and used against officers or others should be unloaded, and at least temporarily, kept in a safe place." *Id.* (citations omitted).

The officers acted reasonably—the touchstone requirement of the Fourth Amendment—in seizing the weapons for the safety of themselves and the apartment's occupants. Accordingly, such a temporary seizure does not violate the Fourth Amendment. *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) ("The Fourth Amendment requires that searches and seizures be reasonable."); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (reiterating that "the touchstone of the Fourth Amendment is reasonableness"). The officers were entitled to maintain control over the weapons while they completed their investigation of the individuals inside the apartment. During that investigation, the officers discovered that Roberts was an unlawful user of a controlled substance and that Booth had a prior felony conviction, and the illegality of the firearms became apparent such that permanent seizure was warranted.

### III

For the foregoing reasons, we AFFIRM Roberts's conviction for violation of 18 U.S.C. § 922(g)(3) and Booth's conviction for violation of 18 U.S.C. § 922(g)(1).