# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-40525

United States Court of Appeals
Fifth Circuit

**FILED**

September 25, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JESUS ALVAREZ,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:16-CR-538-1

Before GRAVES and COSTA, Circuit Judges, and BENNETT, District Judge.*
PER CURIAM:**

Customs and Border Patrol agents at an immigration checkpoint discovered methamphetamine carried by defendant Jesus Alvarez. The district court denied Alvarez's motion to suppress, and he was convicted of possession of methamphetamine with intent to distribute. This appeal followed. We AFFIRM.

---

* District Judge for the Southern District of Texas, sitting by designation.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-40525

I.

On May 26, 2016, a passenger bus arrived at the Sarita immigration checkpoint in south Texas. Customs and Border Protection agents Brian Carter ("Agent Carter") and Joel Carrillo ("Agent Carrillo") boarded the bus, announced they were performing an immigration inspection, and requested that the passengers get their documents ready. Jesus Alvarez ("Alvarez") and his brother Jaime Alvarez ("Jaime") were passengers on the bus.

Agent Carter initially began the immigration inspection with Jaime who was seated in the back of the bus on the aisle seat next to Alvarez. Agent Carter asked Jaime if he was a United States citizen. Jaime replied that he was and presented a United States passport card. The passport card was in a deteriorated condition—lamination was coming off and the photo was unrecognizable. Agent Carter then asked Jaime for additional documents. Jaime provided a birth certificate and a Social Security card. While Jaime was presenting the additional documents, Agent Carter asked Jaime questions about his travel, specifically where he was going and where he lived. Jaime replied that he lived in Brownsville, Texas, and was traveling to Houston to visit his aunt.

Agent Carter also requested to see Jaime's bus tickets. Though Agent Carter asked Jaime for the tickets, it was Alvarez who retrieved the tickets from a bag on the floor and presented them to Agent Carter. While Alvarez was producing the bus tickets, Agent Carter inquired whether they had any luggage. Jaime responded that they did not have any luggage and that their "aunt was going to buy them clothes when they got to Houston." Alvarez stated the same.

When Agent Cater inspected the additional documents presented by Jaime, he noticed that the Social Security card was deteriorated and unsigned.

2

No. 17-40525

The unsigned Social Security card combined with the condition of the passport card raised Agent Carter's suspicion concerning the authenticity of the documents. Agent Carter then asked Jaime if he had a driver's license or some form of picture identification. Jaime responded that he did not have any other form of identification. Agent Carter further asked Jaime his age, to which Jaime responded he was sixteen.

Agent Carter noticed that Alvarez became increasingly nervous during his brother's inspection. Agent Carter turned his investigation to Alvarez and asked if he was a United States citizen, to which Alvarez answered yes and produced a birth certificate, Social Security card, and a Mexican school identification. Agent Carter inquired where Alvarez lived, to which he answered Matamoros, Mexico. Agent Carter then asked Jaime and Alvarez where they were traveling from, and they stated Mexico. Agent Carter followed up by asking where the brothers had crossed the border. Alvarez and Jaime were unable to identify the name of the international bridge they had crossed at.

It was at this point that Agent Carter asked for permission to search Jaime and Alvarez, and they gave the agent permission to do so. Agent Carter estimated in total the immigration investigation of the brothers lasted about one minute and thirty seconds. After both brothers gave Agent Carter consent to search, they were escorted off the bus. Two other Border Agents conducted the search while Agent Carter continued immigration inspections of other bus passengers. Immediately upon patting down Alvarez, the Border Agents discovered packages of methamphetamine taped to his legs.

After being charged with possession with intent to distribute more than 500 grams of methamphetamine, Alvarez moved to suppress the drugs claiming Agent Carter extended the immigration stop beyond its permissible

No. 17-40525

limit and that the consent Alvarez gave Agent Carter to search did not dissipate the taint of the unconstitutionally extended stop.  The district court held an evidentiary hearing at which both Agent Carter and Alvarez testified to the events leading to the search. The district court orally denied the motion to suppress. Alvarez was subsequently found guilty after a bench trial and sentenced to 63 months imprisonment.

Alvarez raises two issues on appeal. Alvarez's primary argument is that Agent Carter's questioning exceeded the permissible scope of an immigration checkpoint stop because Agent Carter extended the detention beyond the limited citizenship inquiry and lacked reasonable suspicion. Additionally, Alvarez argues that even though he consented to a search, suppression is required because his consent was not sufficiently attenuated from the unconstitutional extension of the immigration inspection.

## II.

"When examining a district court's ruling on a motion to suppress, we review questions of law de novo and factual findings for clear error." *United States v. Wise*, 877 F.3d 209, 215 (5th Cir. 2017) (quoting *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009)). Specifically, we review de novo the "ultimate conclusion about the constitutionality of the law enforcement conduct." *United States v. Danhach*, 815 F.3d 228, 233 (5th Cir. 2016) (quoting *United States v. Roberts*, 612 F.3d 306, 309 (5th Cir. 2010)). "We view the evidence introduced at a suppression hearing in the light most favorable to the prevailing party, here, the Government." *United States v. Perales*, 886 F.3d 542, 545 (5th Cir. 2018).

## III.

Border Agents may conduct "suspicionless seizures of motorists" for immigration checks at fixed Border Patrol checkpoints. *Indianapolis v.*

*Edmond*, 531 U.S. 32, 37 (2000) (citing *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976)). The permissible duration of the detention is limited to the time reasonably necessary to complete a brief investigation of matters within the scope of the stop. *United States v. Machuca-Barrera*, 261 F.3d 425, 433 (5th Cir. 2001). "The permissible duration of an immigration stop is therefore the time reasonably necessary to determine the citizenship status of the persons stopped." *Id.* This includes "the time necessary to ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and request consent to extend the detention." *Id.*

Alvarez argues that Agent Carter unlawfully prolonged the immigration investigation when his questions ventured to topics not related to discerning citizenship status. However, the Fourth Amendment protects against "unreasonable seizures, not unreasonable questions." *Machuca-Barrera*, 261 F.3d at 432. Certainly, if a Border Patrol agent is presented with documents that are questionable or insufficient to verify citizenship, the agent can ask for more documents and pose other questions useful to determine the truth of citizenship status. Also, questions about travel including origin and destination would be commonplace for an agent to ask during an immigration inspection. "We will not scrutinize the particular questions a Border Patrol agent chooses to ask as long as in sum they generally relate to determining citizenship status." *Id.* at 434.

We find that Agent Carter's questions concerning Alvarez's citizenship, residence, luggage, and travel plans were all generally related to his mission of determining Alvarez's citizenship status. Furthermore, Agent Carter's questions were posed while requesting and inspecting immigration related documents. There is no indication that these inquiries measurably extended

No. 17-40525

the duration of the immigration stop, therefore, we hold that Agent Carter's immigration check did not violate the Fourth Amendment. Accordingly, the district court properly denied Alvarez's motion to suppress.

IV.

Because we find that Agent Carter did not impermissibly extend Alvarez's detention during the immigration inspection, we need not address Alvarez's second argument concerning whether his consent was sufficiently attenuated from a Constitutional violation.

V.

The decision of the district court is hereby AFFIRMED.