# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 13, 2022

Lyle W. Cayce
Clerk

No. 21-40091

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ANDRES MANUEL ALVAREZ,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:20-CR-41-1

Before JONES, HIGGINSON, and DUNCAN, *Circuit Judges*.
STUART KYLE DUNCAN, *Circuit Judge*:

During a roundup of gang members with outstanding warrants, Corpus Christi police were given information describing one suspect only as a "Hispanic male" who had "run from officers" on a "bicycle with large handlebars" in the "area of Leopard and Up River" at some unspecified time in the past. The officers had nothing else—not the suspect's photo, his age, his build, his clothing, or any other identifying features. Nor were they told when the suspect had last been seen in the area. Nor were they told anything about the bicycle other than it had "large handlebars."

No. 21-40091

Armed with this meager description, the police soon found a person who fit it: Andres Alvarez, who was riding a bicycle with large handlebars in the noted area. Alvarez at first ignored the officers, but he was soon stopped and a frisk revealed he had a revolver and ammo. The officers later determined Alvarez was not the Hispanic male on a bicycle they were looking for. The government then charged Alvarez with being a felon in possession, and Alvarez moved to suppress the evidence against him. The district court denied the motion, holding the officers had reasonable suspicion for the stop.

Reasonable suspicion to stop someone suspected of criminal activity is a low threshold, but not this low. Our cases require officers to have information more specific than "a Hispanic male who once rode away from police on a bicycle with large handlebars in a particular area," especially in Corpus Christi, Texas. That open-ended description would effectively authorize random police stops, something the Fourth Amendment abhors. *See generally Terry v. Ohio*, 392 U.S. 1 (1968). Our dissenting colleague sharply disagrees with our analysis. *Post* at 1–9. But as we explain below, *infra* pp. 16–17, nn.6–7, 10, 13, 15–16, the dissent is mistaken.

We reverse the denial of Alvarez's motion to suppress, vacate his conviction and sentence, and remand for further proceedings.

I.

On July 15, 2019, federal and Texas law enforcement conducted a state-wide "roundup" of known gang members with outstanding warrants. Officer Martin Deleon, a thirty-two-year Corpus Christi Police Department veteran with twenty-eight years in the gang unit, led a team of about a dozen officers. Each team received a packet of fifteen to twenty subjects grouped geographically.

One subject in the Deleon team's packet was described as a "Hispanic male" in the "area of Leopard and Up River." The information stated the

No. 21-40091

subject "may be in the area on a bicycle and that he had run from officers in the past [o]n that bicycle." It described the bicycle only as having "large handlebars." But the officers did not know anything about the bicycle's color or condition or whether it had other identifiers like pegs or distinctive tires. Nor did the officers know the subject's age, body type, or build; whether he had identifying marks or features; what he was last seen wearing; or when he was last seen in the area.

The officers searched for the subject in an apartment complex in the Leopard–Up River area but could not find him, so they left for another location. Officer Deleon and his partner drove in a marked patrol car down Old Robstown Road toward Up River Road, an area known for gang activity. They saw a man who fit the subject's description riding a bicycle with large handlebars on the sidewalk approaching the intersection from the opposite side of Up River Road. The suspect turned left, and the officers turned right, so they were traveling parallel on Up River, with a lane of oncoming traffic between them. The officers pulled alongside the suspect, and Deleon honked the horn and shouted, "stop, pull over[!]" The suspect asked, "Why?" and kept pedaling.

After the suspect traveled about seventy-five yards, the officers pulled ahead of him and blocked the sidewalk. The suspect laid his bicycle down, and the officers grabbed him. They placed him against the car and frisked him, finding a revolver on his waistband and ammunition in his pocket. They cuffed him and put him in their car.

The officers could not immediately identify their detainee. Deleon did not recall the name of the wanted gang member described in the packet. The team apparently had been looking for Jose Morales, "the third or fourth guy on the list." The officers later learned that they had instead detained Alvarez, a convicted felon, who himself had an outstanding warrant.

No. 21-40091

A grand jury indicted Alvarez on one count of being a felon in possession of a firearm and ammunition. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2). Alvarez moved to suppress the revolver and ammo, arguing the officers unlawfully stopped him. At an evidentiary hearing, Deleon testified for the government, and Alvarez introduced bodycam footage from an officer who arrived on scene after the seizure, as well as photographs and maps of the area.

The district court denied Alvarez's motion, holding the stop was supported by reasonable suspicion. *United States v. Alvarez*, No. 2:20-CR-41, 2020 WL 5984078, at *2 (S.D. Tex. Oct. 8, 2020). It reasoned: "Alvarez matched the description of the subject who had an outstanding warrant. He was a Hispanic male, he rode a bicycle with particularly large handlebars, and he was spotted in the area where the subject was known to reside." *Ibid.* The court added that "collectively," these factors were "not so general as to negate reasonable suspicion." *Ibid.* (citing *United States v. Lawson*, 233 F. App'x 367, 370 (5th Cir. 2007) (per curiam)).[1]

Alvarez entered a conditional guilty plea pursuant to an agreement that reserved his right to appeal the suppression ruling. *See* FED. R. CRIM. P. 11(a)(2). The district court sentenced him to time served. Alvarez timely appealed.

---

[1] The government had also argued that Alvarez's riding his bicycle on the sidewalk violated a city ordinance, which justified the stop. But evidence showed the area where the stop occurred was not covered by the ordinance. After the hearing, the government argued that regardless of that point, the stop fell within the good-faith exception to the exclusionary rule. *See United States v. Williams*, 622 F.2d 830, 840 (5th Cir. 1980) (en banc). The district court observed that the officers "believed, incorrectly, that riding the bike on that sidewalk was a violation of a city ordinance." *Alvarez*, 2020 WL 5984078, at *1. Finding reasonable suspicion supported the stop based on the description of the wanted suspect, the court did not reach whether the good-faith exception applied as to the ordinance. *Id.* at *1 n.2.

No. 21-40091

## II.

In reviewing the denial of a motion to suppress, we review factual findings for clear error and legal conclusions *de novo*. *United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020) (citation omitted). Whether officers had reasonable suspicion to support an investigative stop is a question of law. *United States v. Burgos-Coronado*, 970 F.3d 613, 618 (5th Cir. 2020) (citation omitted). We view the evidence in the light most favorable to the prevailing party—here, the government. *United States v. Thomas*, 997 F.3d 603, 609 (5th Cir. 2021) (citation omitted). We will uphold the district court's ruling "if there is any reasonable view of the evidence to support it." *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021) (citation omitted).

## III.

Alvarez challenges only whether the officers had reasonable suspicion for the stop; he does not challenge the frisk. He argues the description of the wanted gang member was too general and the detail about past flight from police on the bicycle was too "sparse" and potentially "stale." The government relies on the description of the subject and the bicycle, the location, and the officers' knowledge of gang activity in the area.[2]

### A.

The Fourth Amendment provides:

---

[2] Alvarez also argues that the officers' mistaken belief that he violated the ordinance was objectively unreasonable. *See supra* note 1. The government does not contend the officers' mistake was reasonable, relying solely on the officers' having reasonable suspicion that Alvarez was the wanted suspect on their list. The government therefore has forfeited any argument of mistake about the ordinance. *See, e.g.*, *United States v. Aguilar-Alonzo*, 944 F.3d 544, 552 (5th Cir. 2019); *United States v. Guillen-Cruz*, 853 F.3d 768, 777 (5th Cir. 2017).

No. 21-40091

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The exclusionary rule, a judicially created deterrence measure, provides that evidence obtained by an unreasonable search or seizure generally may not be used as evidence of guilt at trial. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *Weeks v. United States*, 232 U.S. 383, 393 (1914). Warrantless searches and seizures are *per se* unreasonable subject to certain narrow exceptions. *Cotropia v. Chapman*, 978 F.3d 282, 286 (5th Cir. 2020) (quoting *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002)). The government bears the burden of showing an exception applies. *United States v. Roberts*, 612 F.3d 306, 309 (5th Cir. 2010) (quoting *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005)).

One exception permits officers to conduct brief investigatory stops based on reasonable suspicion that the person is engaged in criminal activity or wanted in connection with a completed felony. *United States v. Hensley*, 469 U.S. 221, 229 (1985); *Terry*, 392 U.S. at 27–31; *see also United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc). A seizure "must be 'justified at its inception.'" *Thomas*, 997 F.3d at 609 (quoting *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004)). Reasonable suspicion therefore "must exist *before* the initiation of an investigatory detention." *Ibid.* (quoting *McKinney*, 980 F.3d at 490).

Reasonable suspicion "is a low threshold, requiring" only a "minimal level of objective justification." *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). But it "must be founded on specific and articulable facts rather than on a mere

suspicion or 'hunch.'" *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (quoting *United States v. Sanders*, 994 F.2d 200, 203 (5th Cir. 1993)). Reasonable suspicion "takes into account the totality of the circumstances—the whole picture." *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)).

"Whether an officer has reasonable suspicion to stop is answered from the facts known to the officer at the time." *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008). Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Thomas*, 997 F.3d at 610–11; *McKinney*, 980 F.3d at 491–95; *Vickers*, 540 F.3d at 361. Facts that appear innocent when viewed in isolation can constitute reasonable suspicion when viewed collectively. *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

A physical description of a suspect known to officers must be sufficiently specific and particularized to justify an investigatory stop. *See, e.g.*, *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736–38 (5th Cir. 2000). "*Terry* does not authorize broad dragnets . . . . Without more, a description that applies to large numbers of people will not justify the seizure of a particular individual." *United States v. Street*, 917 F.3d 586, 594 (7th Cir. 2019) (citing *United States v. Turner*, 699 A.2d 1125, 1128–29 (D.C. 1997)); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) (rejecting justification that would "describe a very large category of presumably innocent" persons).

No. 21-40091

A general, imprecise physical description of a suspect, standing alone, is insufficient to support reasonable suspicion.[3] For example, in *United States v. Jones*, 619 F.2d 494, 496, 498 (5th Cir. 1980), an officer stopped a man matching "the general description that he had heard over the police radio the day before" of "a black male, 5 feet 6 inches to 5 feet 9 inches tall and weighing between 150 and 180 pounds, with a medium afro hair style, who was wearing jeans and a long denim jacket." (The information reported by the police radio was in fact five weeks old. *See id.* at 496.) We found no reasonable suspicion because the officer "acted on the basis of an incomplete and stale description of a suspect that could, plainly, have fit many people." *Id.* at 498. Similarly, in *United States v. Rias*, 524 F.2d 118, 119 (5th Cir. 1975), an officer stopped two black males in a black Chevrolet, knowing that "two black males in a black or blue Chevrolet were suspects in a series of Farm Store robberies" a few weeks prior. We held the facts "clearly did not rise to the required level, and in reality were so tenuous as to provide virtually no grounds whatsoever for suspicion," because "[t]he officer was unsure

---

[3] *See, e.g.*, *United States v. Bailey*, 743 F.3d 322, 349 (2d Cir. 2014) ("[G]eneric descriptions of race, gender, and build, without more, have been held insufficient to justify reasonable suspicion."); *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) (noting "general descriptions of suspects or vehicles . . . standing alone . . . will not support a finding of reasonable suspicion" (citations omitted)); *United States v. Goddard*, 491 F.3d 457, 464 (D.C. Cir. 2007) (Brown, J., dissenting) ("[G]eneric racial descriptions devoid of distinctive individualized details cannot, without more, provide police adequate justification for a *Terry* stop."); 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.5(j), Westlaw (database updated Dec. 2021) (noting a stop is impermissible if "the description provided in the [police] bulletin was so general and vague as to not permit a reasonable degree of selectivity in the making of stops for the purpose of finding the person wanted"); William E. Ringel, Searches and Seizures, Arrests and Confessions § 13:22 (2d ed.), Westlaw (database updated Mar. 2022) (noting a "description must contain more than general characteristics that could fit any number of people" and "[i]f the description is too vague . . . , the stop will be invalidated").

whether the automobile used in the robberies was black or blue; the only description of the robbers was that they were black males; . . . [and] it was not unusual for blacks to be seen in the area." *Id.* at 121.

A less specific description may support reasonable suspicion where there is temporal and geographic proximity to recent criminal activity. 4 LaFave, *supra* note 3, § 9.5(h).[4] In *Vickers*, officers received a report of a recent burglary by a "black male last seen wearing red shirt, blue or black shorts." 540 F.3d at 361. We held the officers had reasonable suspicion to stop a man "wearing clothing that met the description" found "75 to 100 yards from the burglarized home." *Ibid.* Similarly, in *United States v. Hall*, 557 F.2d 1114, 1115–16 (5th Cir. 1977), a police dispatch reported an armed robbery by three men—two black and one either black with a light complexion or white—who fled in a red 1969 two-door Ford. An officer stopped "a red 1969 Ford driven by a light complexioned black male, proceeding away from the vicinity of a bank robbery within twenty minutes after the robbery." *Id.* at 1116–17. We upheld the stop, emphasizing that "[t]he most important factors" were "the timing of the initial stop and its location." *Id.* at 1117.

---

[4] *See United States v. Edwards*, 469 F.2d 1362, 1365 (5th Cir. 1972) (upholding stop where officer "had personally observed the appellants' car in the vicinity of two armed robberies shortly after the crimes had been committed [and] [t]he occupants fit the sex and race of the robbers and the driver was wearing a bush hat, a distinctive item of apparel described by one of the victims"); *see also, e.g.*, *Irvin v. Richardson*, 20 F.4th 1199, 1205 (8th Cir. 2021) ("[A] person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." (collecting cases)); *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 559–60 (4th Cir. 2017) ("Courts have typically found reasonable suspicion to stop . . . an individual who closely resembles a description or composite sketch when that resemblance is combined with *both* geographic and temporal proximity." (collecting cases)).

No. 21-40091

Accordingly, our case law distinguishes between stops related to completed crimes and stops related to ongoing crimes or crimes very recently committed. *See Jones*, 619 F.2d at 498 (distinguishing case from those "where an officer has acted upon timely information of criminal activity" (citing *Hall*, 557 F.2d 1114)); *see also United States v. Lopez*, 907 F.3d 472, 485 (7th Cir. 2018) (rejecting "application of those cases involving urgent situations to the cold surveillance involved here").

B.

The officers' stop of Alvarez was not supported by reasonable suspicion. This case involves an outstanding warrant—completed criminal activity—so the information the officers relied on must satisfy a higher level of specificity than if they were responding to a report of ongoing or very recent criminal activity. *See Jones*, 619 F.2d at 498; *Hall*, 557 F.2d at 1114.[5] The government cannot clear this hurdle under our precedent. If a weeks-old description of two black males in a black or blue Chevrolet was insufficient to stop two black males in a black Chevrolet, *Rias*, 524 F.2d at 119–21, and a five-week-old description of a man's race, height, weight, hair style, and clothing was insufficient to stop someone matching it, *Jones*, 619 F.2d at 496, 498, then the description of a Hispanic male who had once ridden a bicycle with large handlebars in a general area at some unknown time in the past

---

[5] *See also* 4 LaFave, *supra* note 3 (observing "it would be incorrect to assume that a wanted-man bulletin concerning a past crime need be no more specific than those descriptions often held to suffice as to stops made in the vicinity of a crime very recently committed" (citing *Rias*, 524 F.2d 118)). At oral argument, the government claimed there was an "ongoing situation" with "ongoing crime" because the subject is in a "constant, perpetual state of being wanted until he is captured." O.A. Rec. 26:50–27:07, *available at* https://coa.circ5.dcn/OralArgRecordings/21/21-40091_1-5-2022.mp3. We disagree. Even assuming there is a basis for such a theory, the government introduced no evidence about the crime for which the subject gang member was wanted or when the crime was committed. *See id.* at 24:25–24:45, 27:07–27:28.

No. 21-40091

cannot justify the stop of Alvarez.[6] To explain why this is so, we consider in detail each factor relied on by the government—the description of the subject and the bicycle, the location, and the officers' knowledge of local gang activity.[7]

The subject's physical description was too general and vague. The officers did not have a photograph and did not otherwise "know what [the suspect] looked like." Other than race and sex, they knew of no descriptors—age, height, weight, identifying marks, or clothing. *See supra* note 3; *cf. United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 401 (7th Cir. 1975) (rejecting argument that "police bulletin relied upon was too vague and overbroad in its description of the wanted man" because it had "a picture of the wanted man as well as a description of his physical characteristics"). "Hispanic" has negligible predictive value here given Corpus Christi is predominantly Hispanic or Latino.[8] Put simply, the physical description "fit too many

---

[6] The government ignores our decisions in *Jones* and *Rias*. And at oral argument, the government could not identify any case that supports its position that the description supported reasonable suspicion. O.A. Rec. 17:43–18:18 ("We don't have a best case for description."). Contrary to the dissent's claims, we have not misapplied *Jones* and *Rias*. *Post* at 3. Those cases directly show why the physical description here was inadequate to support the stop. Indeed, the dissent acknowledges that "*Jones* and *Rias* suggest only that the description of Alvarez, by itself, would be insufficient." *Post* at 3. The dissent would distinguish those cases, however, by pointing to other information the government relies on, as well as some information it does not. *Post* at 3–4. But, as we explain below, that other information was inadequate to justify the stop. So, contrary to the dissent, *Jones* and *Rias* are "dispositive." *Post* at 3.

[7] Given our analysis of multiple factors, we disagree with our dissenting colleague that we ignore the "totality of the circumstances" and instead "narrowly" focus "solely" on the "suspect's physical description." *Post* at 1–4. In reality, the dissent disagrees with our assessment of the additional factors, to which we respond below. Moreover, the dissent adds another factor—the fleeing-the-police notion—which is unsupported by the record and has, in any event, been forfeited by the government. *See infra* pp. 16–17.

[8] Corpus Christi is 63.8% Hispanic or Latino. *QuickFacts: Corpus Christi City, Texas*,                    U.S.                    Census                    Bureau,

No. 21-40091

people[] to constitute particular, articulable facts on which to base reasonable suspicion." *Goodson*, 202 F.3d at 737 (citing *Jones*, 619 F.2d at 497–98; and *Rias*, 524 F.3d at 121); *see also, e.g.*, *United States v. Arthur*, 764 F.3d 92, 98 (1st Cir. 2014) (observing a "physical description of a black man in dark, heavy clothing . . . would likely be insufficient to give rise to reasonable suspicion" because it "might fit a significant percentage of the local population on a late October day").

The same is true of the bicycle. Other than "large handlebars," the officers knew of no identifiers—color, make, model, condition, features, or style of handlebars. "Large handlebars" pales in comparison to vehicle descriptions that have created or contributed to reasonable suspicion.[9] Furthermore, when asked if certain types of large handlebars were "more prevalent in that area," Officer Deleon answered, "most bikes have regular handlebars. Those there . . . will stand out . . . because they're not normal." "But the success or failure of a suppression motion cannot hinge on an officer saying, in essence, 'I know it when I see it.'" *United States v. Drakeford*, 992 F.3d 255, 267 (4th Cir. 2021) (Wynn, J., concurring). Unable to point to

---

https://www.census.gov/quickfacts/corpuschristicitytexas (last visited July 13, 2022); *see Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571–72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice." (collecting cases)).

[9] *See United States v. Jaquez*, 421 F.3d 338, 340–41 (5th Cir. 2005) (per curiam) (holding "red vehicle" was too "sparse and broadly generic" to stop a red car in vicinity of shooting fifteen minutes later because officer had no other "particular information about the vehicle, such as its make or model, or any description of its occupant(s)"); *cf. United States v. Campbell*, 178 F.3d 345, 347–48 (5th Cir. 1999) (upholding stop where person "matched the physical description" of bank robber and "was approaching a car that matched a detailed description of the getaway vehicle and bore the same license plate," specifically "a late 1980s, black Chevrolet Cavalier with Tennessee license plate 600TTP"); *cf. also United States v. Brown*, 558 F. App'x 386, 392 (5th Cir. 2014) (per curiam) (upholding stop where victim identified truck as "look[ing] just like" suspects' truck and it "matched the make, model, and color" and had the same license plates).

specific identifiers, the government has not shown that Alvarez's handlebars were sufficiently distinctive to create reasonable suspicion. *See United States v. Jones*, 998 F.2d 883, 885 (10th Cir. 1993) (holding "flimsy" description of two black men in black Mercedes did not support stop "based solely on the color and manufacturer of the car, and the fact that it contained two black men," particularly with no showing that "the sight of two African–Americans in a black Mercedes was a highly unusual event").[10]

The location fares no better. The officers knew only that the subject had previously been seen in the Leopard–Up River area and "may be" there. They had no information whatsoever about where in the area he had been seen[11] or when he had been seen there—whether "that day," "the day

___

[10] The dissent argues we should defer to Officer Deleon's view that the descriptor "large handlebars" was specific enough to equate Alvarez's bicycle with the wanted suspect's. *Post* at 4. We disagree. As explained, this vague description is nowhere close to the kind of vehicle descriptions that would support reasonable suspicion. And, contrary to the dissent, there is nothing "illogical" in relying on automobile cases. *Post* at 4. If the description of a "red vehicle" involved in a shooting fifteen minutes ago is too generic to support stopping any red car in the vicinity, *Jaquez*, 421 F.3d at 340–41, then so is the description of a bicycle with "large handlebars" from an unknown time in the past.

Moreover, the dissent offers no basis in the record for speculating that bicycles "are far less numerous—and therefore more readily identifiable—on the streets that automobiles" or that "large handlebars" are "more akin to a very distinctive hood ornament or wheel covers" than to a car's color, make, or model. *Post* at 4. Moreover, as discussed at oral argument, the government could have bolstered the record on any of these points—say, by putting into the record what the suspect's bicycle looked like, why it was similar to Alvarez's, or why "large handlebar" bikes are distinctive—but it failed to do so. O.A. Rec. 27:08–27:29, 30:12–30:22, 33:38–33:57 (panel members questioning government about "shortcomings" in the record); *see, e.g.*, *United States v. Rangel-Portillo*, 586 F.3d 376, 382 (5th Cir. 2009) (finding most "indicative of a stop lacking in reasonable suspicion . . . in this case . . . is what is missing from the record"); *United States v. Lopez-Valdez*, 178 F.3d 282, 287–88 (5th Cir. 1999) (reversing denial of suppression motion based on government's failure to introduce evidence of relevant reasonable-suspicion factors).

[11] The government claims the location was a "narrow geographic area." O.A. Rec. 16:42–50, 17:16–23. Despite admitting "the record describes [the area] in different ways,"

No. 21-40091

before," or "the week before." Nor did they have reason to believe he might still have been in the area—for example, if he resided there.[12] *See Jones*, 619 F.2d at 498 (finding description of suspect from robbery five weeks ago "stale"); *see also United States v. Longmire*, 761 F.2d 411, 420 (7th Cir. 1985) (discussing staleness of information in police bulletins).[13]

The government also relies on the area being known by the officers for gang activity. It is true that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation," and so "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124 (citing *Adams v. Williams*, 407 U.S. 143, 144, 147–48 (1972)); *see also United States v. Flowers*, 6 F.4th 651, 656 (5th Cir. 2021) (same) (citing *Wardlow*, 528 U.S. at 124). Still, "[a]n individual's presence in an area of expected criminal

---

it insists "the most specific description is that it was just . . . the intersection of Leopard and Up River." *Id.* at 16:50–17:06. The record does not limit the description to the intersection, however. Officer Deleon loosely described the area, and before spotting Alvarez, the officers had been looking for the subject in a nearby apartment complex.

[12] The district court erroneously stated the subject was "known to reside" in the area. *Alvarez*, 2020 WL 5984078, at *2. This finding is wholly unsupported by the record. *See United States v. Castillo*, 430 F.3d 230, 243–44 (5th Cir. 2005). The government confirmed this at oral argument. *See* O.A. Rec. 35:22–36:06 ("There was no testimony specifically to [the subject's] residence."). The officers knew only that the subject had been seen in the area and so they believed he might be there.

[13] The dissent claims we require officers to "know *exactly* when and where the subject had previously been seen." *Post* at 5. Our opinion imposes no such requirement. All we say is that the bare-bones location the officers had—that a Hispanic male was once seen riding a bike near an intersection at some unspecified time in the past—was not enough to create reasonable suspicion. One strains even to call this information "stale" because there is nothing in the record to suggest when the suspect was last seen near the intersection (a week ago? a month? a year? three years?). *Cf., e.g.*, *Jones*, 619 F.2d at 498 (for purposes of a *Terry* stop, contrasting a five-week-old "incomplete and stale description of a suspect" with "timely information of criminal activity").

No. 21-40091

activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)). Something more is needed— some observed fact beyond the person's mere presence that gives an officer "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *Vickers*, 540 F.3d at 361 (quoting *Hensley*, 469 U.S. at 227).[14] That is where the government stumbles. Beyond Alvarez's presence in a high-crime area, it points to no fact suggesting that Alvarez "ha[d] been, [wa]s, or [wa]s about to be engaged in criminal activity." *Ibid.*[15]

---

[14] *See also, e.g.*, *McKinney*, 980 F.3d at 492 (holding officers' awareness of recent gang shootings in area did not create reasonable suspicion because they had no "articulable suspicion about a connection between the person [stopped] and those crimes"); *Thomas*, 997 F.3d at 610 (*Terry* stop justified if officers have "a particularized and objective basis for suspecting the particular person stopped of criminal activity," a standard satisfied "if specific and articulable facts give rise to a suspicion that the person stopped has committed, is committing, or is about to commit a crime" (internal quotation marks omitted) (first quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); then quoting *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017))).

[15] The dissent incorrectly asserts that our analysis "shrink[s] the boundaries articulated in *Wardlow* and disabl[es] officers from responding in high crime areas." *Post* at 6. To the contrary, we recognize—along with the Supreme Court and our precedents— that a person's presence in a high crime area, while *relevant*, is not enough *standing alone* to create reasonable suspicion for a *Terry* stop. Something more is needed, and on this record, it is lacking.

The dissent is also mistaken that we "did not" mention that "Alvarez's stop was the result of a coordinated 'roundup' of gang members." *Post* at 7. Literally the first words of our opinion are: "During a roundup of gang members with outstanding warrants . . . ." *Supra* p. 1. Nor does our opinion slight the "enhanced danger to police officers" during gang roundups, as the dissent claims. *Post* at 7. This case has nothing to do with officers' settled right to *frisk* suspects who have been properly stopped. Alvarez does not even contest the frisk. This case is solely about whether the *stop* preceding the frisk was supported by reasonable suspicion. *See, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009) ("*[T]o proceed from a stop to a frisk*, the police officer must reasonably suspect that the person stopped is armed and dangerous." (emphasis added)). The dissent's cited cases

No. 21-40091

Finally, our dissenting colleague asserts that the stop was justified because Alvarez "fle[d]," "abscond[ed]," and "deliberately evaded" the officers. *Post* at 2, 4 n.6, 8. Not so. If any of that were true, this case would be governed by *Illinois v. Wardlow*, 528 U.S. 119. There, Wardlow—while standing in an area known for drug dealing and "holding an opaque bag"— saw patrolling officers and "fled," running through a "gangway and an alley" before being stopped. *Id.* at 121–22. This "[h]eadlong flight" was, the Court explained, "the consummate act of evasion[,]" justifying the officers "in suspecting that Wardlow was involved in criminal activity." *Id.* at 124–25.

*Wardlow* is nothing like this case. Alvarez was not "absconding" or "fleeing" from the police—he was already riding his bicycle when Officer Deleon spotted him, and he ignored the officers and kept riding when asked to stop. He had every right to do so. *See id.* at 125 ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983))). So, "this is not a case of headlong flight at the mere sight of a police officer." *Hill*, 752 F.3d at 1037 (cleaned up). The dissent is thus mistaken in saying our analysis "is in serious tension" with *Wardlow* or any other case involving unprovoked flight or evasive behavior. *Post* at 4 n.6, 5. If there were any doubt, the government conceded at oral argument that this case is not *Wardlow*. *See* O.A. Rec. 19:25– 19:34 ("I understand this is not the same as flight. I am not suggesting this

---

support the basic distinction between a stop and a frisk, as each case primarily concerned a frisk. *See post* at 7–8 (citing *United States v. Rideau*, 969 F.2d 1572, 1576 (5th Cir. 1992) (en banc); *Michelletti*, 13 F.3d at 844; and *United States v. Sanders*, 994 F.2d 200, 207 (5th Cir. 1993)). No case the dissent cites supports the proposition that, during a gang roundup, the *Terry* standard for initiating a stop should be relaxed.

No. 21-40091

case had the same facts such as *Illinois v. Wardlow*, where unprovoked flight was enough.").

## C.

The government further defends the stop by arguing the description, location, and gang activity were "identified in the information obtained by the officers during the gang roundup investigation," citing the collective knowledge doctrine. We disagree.

"[R]easonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013). This doctrine applies "so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts." *Ibid.* (quoting *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007)). Officers may conduct an investigatory stop in reliance on information issued through police channels, such as a wanted flyer or bulletin or a radio dispatch, if the information is based on "articulable facts supporting a reasonable suspicion that the wanted person has committed an offense." *Hensley*, 469 U.S. at 232 (flyer or bulletin); *see, e.g.*, *United States v. Cutchin*, 956 F.2d 1216, 1217–18 (D.C. Cir. 1992) (radio dispatch). But if the information "has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." *Hensley*, 469 U.S. at 232.

Officer Deleon's team could rely on the information in the round-up packet only "if the police who *issued* [the packet] possessed a reasonable suspicion justifying a stop." *Id.* at 233. But Deleon did not know who provided the information in the packet, and he only vaguely described the investigation leading up to the round-up. And the government did not introduce into evidence the packet or any details about the origin or timeliness of the information therein to show that it was premised on

No. 21-40091

articulable facts. *See* O.A. Rec. 29:20–30:45. As our dissenting colleague remarked at oral argument, "the government didn't offer the packet into [evidence]. That is incredibly derelict . . . ." *Id.* at 30:12–30:22; *see also id.* at 33:54–33:57 (government conceding "[t]here are certainly shortcomings" in the record).

We do not blindly accept officers' reliance on information obtained through police channels; the government must substantiate the basis of the information. *See Hensley*, 469 U.S. at 232–33; *United States v. Maryland*, 479 F.2d 566, 569 (5th Cir. 1973). Because the government here has not established reasonable suspicion that could have been transferred between officers, the collective knowledge doctrine does not apply. *Cf. United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) (noting "if [Agent] Mattas possessed sufficient reasonable suspicion to stop the van when he made his call to the dispatcher, then the actual stop by the [police] officers, acting on the dispatcher's bulletin, was also supported by reasonable suspicion" (citing *Hensley*, 469 U.S. at 232)).[16]

---

[16] The dissent asserts that our discussion of the collective knowledge doctrine is "dicta" because "[t]he government hardly broached, and in fact, disclaimed its reliance on this doctrine." *Post* at 9. That is incorrect. Collective knowledge has always been an issue in this case. The district court's order denying the motion to suppress relied, in part, on the "collective knowledge and experience of the officer or officers." *Alvarez*, 2020 WL 5984078, at *2 (citation omitted). And the government's brief to our court sought to justify the stop, in part, based on the collective knowledge doctrine. *See* Brief of Plaintiff-Appellee at 20–21, *United States v. Alvarez*, No. 21-40091 (5th Cir. July 7, 2021), ECF No. 35 (relying on the officers' "collective knowledge" and citing authorities); *id.* at 22–23 (arguing stop was justified based on officers' possession of "packets of information of wanted subjects," the suspect "was collectively identified as a Hispanic male," and the "area is collectively known by law enforcement for gang activity"). Finally, the government never "disclaimed its reliance" on the doctrine; to the contrary, when asked about the doctrine at oral argument, the government responded, "Collective knowledge is certainly important in this case, and it's certainly relevant." O.A. Rec. 29:15–29:35.

No. 21-40091

IV.

We REVERSE the denial of Alvarez's motion to suppress, VACATE his conviction and sentence, and REMAND for further proceedings consistent with this opinion.

EDITH H. JONES, *Circuit Judge*, dissenting:

It is axiomatic that reasonable suspicion "takes into account the totality of circumstances—the whole picture." *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020) (quoting *Navarette v. California*, 572 U.S. 393, 397, 134 S. Ct. 1683, 1687 (2014)). Despite this clear standard, the majority opinion narrowly focuses on the suspect's physical description while disregarding several additional facts that supported the *Terry* stop of Alvarez in this case. The majority's unduly restrictive view of reasonable suspicion is inconsistent with our precedent and that of the Supreme Court. I respectfully dissent.

## BACKGROUND

In the summer of 2019, several law enforcement agencies combined resources to conduct a state-wide "roundup" of gang members with outstanding warrants. Officer Martin Deleon, an experienced police officer with 32 years on the force, 28 of them in the Police Gang Unit, led part of this effort. Teams of officers were provided packets of subjects, divided based on geographic location. Such "roundups" are more dangerous than regular patrol assignments because the officers are specifically pursuing criminals who are known to be violent.

One of the suspects on Officer Deleon's list was described as a "Hispanic male" on a "bicycle with large handlebars" who had been previously seen in the Leopard and Up River area and who "had run from officers in the past" on his bicycle. While on patrol for these wanted gang members, Officer Deleon and his partner spotted a Hispanic male riding a bicycle with unusually large handlebars on the sidewalk on Up River Road traveling toward Leopard, an area known for gang activity. Officer Deleon

also observed that the individual was riding his bicycle on the public sidewalks, which is illegal by ordinance in many places in Corpus Christi.[1]

The officers first attempted to make contact with the man (later determined to be Alvarez) by pulling up next to him, honking, and telling him to "stop" and "pull over." Alvarez refused to do so, and at one point asked "why?" while riding on. The officers drove next to him for about seventy-five yards, giving him "a few chances to stop." Eventually, the officers cut him off by pulling the patrol car into a driveway entrance, blocking his ability to continue biking on the sidewalk. A protective frisk uncovered a handgun and ammunition on Alvarez, a convicted felon. Thus was Alvarez charged with a federal gun violation.

Based on these facts, the majority determines that the officers acted solely based on a general, imprecise physical description of the suspect. *See generally* Maj. Op. 8–13. Little attention, if any, is given to the collective features of the stop, including that it (i) was part of a systematic "roundup" of gang members with outstanding warrants, which involved enhanced danger to police officers and increased risk of violence; (ii) was conducted in an area known for gang activity; (iii) was performed by a seasoned police officer with 28 years of experience in the gang unit; and (iv) involved the search for a Hispanic male, riding a bicycle with unusually large handlebars in the Leopard and Up River area. Importantly, the sought-after suspect also had a history of absconding from the police on his bicycle, behavior replicated when Alvarez deliberately evaded their requests to stop for seventy-five yards.

---

[1] During the suppression hearing, the defense established that the ordinance did not apply to the area where the officers stopped Alvarez. Officer Deleon testified that he was unaware that this area was not covered by the ordinance when he stopped Alvarez.

No. 21-40091

## DISCUSSION

Reasonable suspicion is a "low threshold," which requires only a "minimal level of objective justification." *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581 (1989)). "[T]he level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Glover*, 140 S. Ct. at 1187 (internal quotation marks omitted). The majority acknowledges this low bar and even cites several "relevant facts and considerations" in the calculus,[2] noting that otherwise innocent facts, when viewed in isolation, can collectively amount to reasonable suspicion. *United States v. Arvizu,* 534 U.S. 266, 277, 122 S. Ct. 744, 753 (2002). Nonetheless, the majority overrules the district court and finds *no* reasonable view of the record that provided the officers here with anything more than a hunch. *But see United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc) ("[T]his court 'should uphold the district court's ruling to deny the suppression motion if there is any reasonable view of the evidence to support it.'" (quoting *United States v. Register*, 931 F.2d 308, 312 (5th Cir. 1991))). The majority opinion errs for several reasons.

First, neither of the cases principally relied on by the majority compels rejecting the basis for Alvarez's stop. In each case, unlike the present one, *the only information* the police articulated to justify reasonable suspicion was general physical descriptions. *See, e.g., United States v. Jones*, 619 F.2d 494, 496–98 (5th Cir. 1980) (when officers act solely "on the basis of an

---

[2] The facts and considerations include "a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." Maj. Op. at 7. By my reckoning, as will be shown, four of those five factors are present here.

No. 21-40091

incomplete and stale description of a suspect that could, plainly, have fit many people," there is no "reasonable" suspicion); *United States v. Rias*, 524 F.2d 118, 119, 121 (5th Cir. 1975) (suspicion arising exclusively from the description of "two black males in a black or blue Chevrolet [who] were suspects in a series of . . . robberies," which was "so tenuous as to provide virtually no grounds whatsoever for suspicion"). *Id.* at 121.

These cases furnish no authority for overturning the considered view of the district judge after a hearing. Far from being dispositive, *Jones* and *Rias* suggest only that the description of Alvarez, by itself, would be insufficient.[3] But as discussed below, Alvarez's physical description had to be considered along with his behavior, the location in which he was riding, Officer DeLeon's experience, and the high-stakes nature of the officers' activity. "In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other." *United States v. Lopez-Moreno,* 420 F.3d 420, 430 (5th Cir. 2005).[4]

Next, the totality of circumstances strongly supports the *Terry* stop of Alvarez. Obviously, Alvarez matched the description of a Hispanic male

---

[3] The majority draws from these two cases an additional requirement that the police should not be able to claim reasonable suspicion when the suspect's description has become "stale" by passage of time following the crime. Maj. Op. at 10–11, 13–14. There is no evidence in the record that Alvarez's warrant, much less the description of his unusual bike and behavior toward police, was "stale." That the majority construes this gap in the record *against* the government and the district court's judgment is characteristic of its reasoning in this case, but flouts the requirement that, on appeal, all "evidence and inferences . . . are reviewed in the light most favorable to the Government as the prevailing party." *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012).

[4] *See also United States v. Tuggle*, 284 F. App'x 218, 223–26 (5th Cir. 2008) (unpublished) (reversing a district court for "erroneously split[ting] the evidence" rather than "objectively examin[ing] the 'totality of the circumstances'"); *United States v. Lawson*, 233 F. App'x 367, 370–71 (5th Cir. 2007) (unpublished) ("Each factor by itself may not justify a *Terry* stop; but, the totality of these factors, along with [the defendant's] unprovoked flight, provided the Officer with reasonable suspicion to detain him.").

riding a bicycle with large handlebars.  And his conduct in continuing to ride his bike while ignoring the officers until they blocked his path was consistent with the gang member's evasive behavior as described in the officers' briefing.  The majority, however, understates or disregards other significant features about the stop, such as its geographic location, Officer DeLeon's relevant experience, and the nature of the officers' pursuit.  The officers' apprehension of Alvarez was based on all these factors.

The majority belittles the officer's explanation that the large handlebars on Alvarez's bike "will stand out ... because they're not normal."  But the majority's only support for denying the relevance of this fact is by analogy with cases about automobile descriptions.  Maj. Op. at 12 n.9.  This is illogical.  Bicycles are plainly distinct from automobiles.  They have no license plates and are far less numerous—and therefore more readily identifiable—on the streets than automobiles.  Moreover, unlike one case's insufficient generic description of a "black Mercedes," "large handlebars" on a bike are more akin to a very distinctive hood ornament or wheel covers than an automobile's make and color.[5]   Furthermore, discounting the officer's experience borne of practical observation is contrary to the record and applicable law.

Contrary to the majority's conclusions, Alvarez's location was significant because he was found in the general vicinity where the subject of the warrant "had been seen" and this area was also independently known for gang activity.  Thus, his location both corroborated the description provided to the officers *and* afforded the officers the right to consider the heightened

---

[5] The majority asserts that there is "no basis" on which to differentiate the basic features of automobiles from the basic features of bicycles.  Maj. Op. at 13 n.10.  But what the majority calls "speculat[ion]" some would call common sense.

criminal activity in that area.[6] *United States v. Flowers*, 6 F.4th 651, 656 (5th Cir. 2021) ("[T]he fact that the stop occurred in a high crime area is among the relevant contextual considerations in a *Terry* analysis." (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000))).

Yet the majority erroneously discredits reliance on the high-crime characteristics of the location for either purpose. Without citing any authority, it determines that, because the officers did not know *exactly* when and where the subject had previously been seen within the "Leopard-Up River area," the fact that Alvarez was found in this admittedly geographically confined area was insignificant. Again, this conclusion flouts the requirement that appellate courts "review the evidence in the light most favorable to the government as the prevailing party." *Michelletti*, 13 F.3d at

---

[6] The Fifth Circuit has repeatedly upheld findings of reasonable suspicion where defendants absconded from law enforcement in high crime areas. *See, e.g.*, *United States v. Darrell*, 945 F.3d 929, 933–35 (5th Cir. 2019) (upon spotting law enforcement, defendant walked away quickly outside of a house known for crime); *United States v. Sanders*, 994 F.2d 200, 207 (5th Cir. 1993) (defendant walked away after spotting a squad car pulling up in a high crime area); *Tuggle*, 284 F. App'x at 224–26 (defendant "walked briskly away from the officers" in a high crime neighborhood); *Lawson*, 233 F. App'x at 370 (defendant ran away when approached by law enforcement in a high crime neighborhood).

Unfortunately, the majority, following its pattern of construing all factual inferences against the government, concludes that Alvarez's evasion was emphatically *not* an attempt to abscond from the police. But our case law supports a broad definition of "evasion" for purposes of reasonable suspicion. *See, e.g., Darrell*, 945 F.3d at 935–36, 939 (where defendant merely "walked away from the police and never left their field of vision," such evasive behavior in a high-crime area was sufficient to warrant a stop); *Sanders*, 994 F.2d at 207 (holding that "[o]nce [defendant] saw the squad car pulling up . . . and started to walk away," the officer had reasonable suspicion to stop him and "did not act unreasonably in immediately drawing his weapon when he confronted" him)." In *Sanders*, this court added that walking away "can be used by a criminal to prepare for a violent confrontation by surreptitiously retrieving a concealed weapon then spinning back around to face the officer and use the weapon against him," and the officers feared for their own safety and the safety of the public. *Id.* But this majority ignores our precedent merely because the confrontation with Alvarez did not result in "headlong flight."

841. Beyond that, the majority rejects the significance of this high crime neighborhood because the government mentioned "no fact suggesting that Alvarez 'had been, was, or was about to be engaged in criminal activity.'" Maj. Op. at 15 (quoting *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008)). But it is unclear what the majority requires the officers to have observed beyond the circumstances present in this case. On the contrary, this court has held that evading officers in an area known for crime is enough to meet the "low threshold" for a brief investigatory stop. *United States v. Darrell*, 945 F.3d 929, 933–35 (5th Cir. 2019).[7]

Furthermore, Supreme Court precedent is in serious tension with the majority's analysis. In *Wardlow*, the officers had reasonable suspicion after observing the defendant flee from police officers in an area known for heavy narcotics trafficking. 528 U.S. at 124–25, 120 S. Ct. at 676. *That is all*. The officers witnessed nothing else on the ground that would have connected the defendant to narcotics trafficking. Yet, the Supreme Court explained:

> [O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a *Terry* analysis.

*Id.* at 124 (citing *Adams v. Williams*, 407 U.S. 143, 144, 147–148, 92 S. Ct. 1921, 1922–24 (1972)). The Court further stated that conduct which is "ambiguous and susceptible of an innocent explanation" can justify a *Terry* stop. *Id.* at 125. In fact, "*Terry* accepts the risk that officers may stop innocent people." *Id.* at 126; *see also Arvizu*, 534 U.S. at 277, 122 S. Ct. at 753 ("A determination that reasonable suspicion exists, however, need not

---

[7] *See supra* note 6.

rule out the possibility of innocent conduct."). But the majority construes the Fourth Amendment to require more, shrinking the boundaries articulated in *Wardlow* and disabling officers from responding in high crime areas (and thereby endangering law-abiding residents) absent some obscure "observed fact."[8] Also important is that *Terry* does not require "particularized suspicion of a particular, specific crime, as distinguished from a particular and objective basis for suspecting the detained person or persons of some criminal activity." *United States v. Pack*, 622 F.3d 383, 383 (5th Cir. 2010) (collecting cases). Otherwise, an officer's reasonable suspicion elevates to probable cause.

The majority's analysis fails to consider other collective features of the stop, including Officer Deleon's extensive experience in the Police Gang Unit. "In assessing reasonableness, 'due weight' must be given to the facts and inferences viewed 'in light of [the officer's] experience.'" *Michelletti*, 13 F.3d at 841 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968)). The Court in *Terry* emphasized the importance of affording some deference to an officer's seasoned judgment when assessing his suspicion

---

[8] The majority cites *United States v. McKinney* in support of its analysis, which is wholly inapposite. 980 F.3d 485, 492 (5th Cir. 2020). There, this court affirmed the uncontroversial rule that the mere fact that an area is known for a specific type of criminal activity does not support a reasonable inference that anybody found in that area is engaged in crime. But it is also uncontroversial that officers may consider "the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious." *Wardlow*, 528 U.S. at 124, 120 S. Ct. at 676.

Also note that *McKinney* rejected a denial of suppression on a bare record and remanded the case for factfinding. 980 F.3d at 496–97. Because there had not been an evidentiary hearing, the district court made "no credibility determinations" and "the record before [the appellate court was] insufficient to determine whether the officers had reasonable suspicion." *Id.* Whereas here, the district court's findings are shielded by clear error. *See also infra* note 10.

No. 21-40091

post hoc.[9] 392 U.S. at 12, 88 S. Ct. at 1875 ("[W]e approach the issues in this case mindful of the limitations of the judicial function in controlling the myriad daily situations in which policemen and citizens confront each other on the street."). At the suppression hearing,[10] Officer Deleon testified that, based on his experience, it was unusual behavior for an individual to not pull over voluntarily after being asked to stop by the police. Further, he knew from his extensive law enforcement experience with gangs that the Leopard-Up River area was known for gang activity. And because he had previous experience with criminals on bicycles, he was aware that the handlebars on Alvarez's bicycle were unusually large compared to the typical bicycle. Yet, the officer's underlying qualities are afforded no credit in the majority's analysis.

Finally, it is important to reiterate, since the majority did not,[11] that Alvarez's stop was the result of a coordinated "roundup" of gang members.

---

[9] The Supreme Court has repeated this admonishment since *Terry*. *See, e.g., Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996) ("[W]e hasten to point out that a reviewing court should take care . . . to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."); *id.* ("[A] police officer views the facts through the lens of his police experience and expertise."); *Arvizu*, 534 U.S. at 273, 122 S. Ct. at 750–51 ("[In assessing whether there is reasonable suspicion, officers are allowed] to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (internal quotation marks omitted)).

[10] Special deference is owed to the trial court where, as here, the trial court heard live oral testimony. *Ornelas*, 517 U.S. at 700, 116 S. Ct. at 1663 ("An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable."); *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 910 (2022) ("Our review is particularly deferential where denial of the suppression motion is based on live oral testimony because the judge had the opportunity to observe the demeanor of the witnesses." (quoting *United States v. Aguirre*, 664 F.3d 606, 612 (5th Cir. 2011))).

[11] *Cf.* Maj. Op. at 15–16 n.15. The majority defensively contends that it did in fact note that the stop was a result of a roundup of gang members. But the point is not the

Officer Deleon testified that such "roundups" often involve enhanced danger to police officers and increased risk of violence because officers are targeting known criminals. Officer and citizen safety have consistently been relevant considerations in the reasonable suspicion analysis. Reviewing courts must "look to the reality that the setting in which the police officer acts may reasonably and significantly affect his decisional calculus." *United States v. Rideau*, 969 F.2d 1572, 1576 (5th Cir. 1992). And when an officer is unsure whether an individual is dangerous, a "minimally intrusive action" to ensure the safety of the public and the officers does not constitute a constitutional violation. *Id. See also Michelletti*, 13 F.3d at 844 ("Surely the constitutional legitimacy of a brief patdown . . . may and should reflect the horrendously more violent society in which we live, twenty-five years after *Terry*."); *United States v. Sanders*, 994 F.2d 200, 207 (5th Cir. 1993). The heightened danger inherent in this encounter should be considered among the factors supporting the prophylactic reasonableness of the officer's suspicion.

The majority suggests that officers can only consider danger to police officers and the public when determining whether to conduct a "frisk." Maj. Op. at 15–16 n.15. On the contrary, our precedent does not limit safety concerns to frisks.[12]  Here, based on what Officer Deleon knew at the time

---

majority's cursory reference to the fact of the round-up, but the absence of that fact from the majority's assessment of reasonable suspicion.

[12] *United States v. Hensley*, 469 U.S. 221, 105 S. Ct. 675, 680–84 (1985) (authorizing *Terry* stops for "investigation of past crimes," particularly in the context of "felonies or crimes involving a threat to public safety"); *Florida v. J.L.*, 529 U.S. 266, 272, 120 S. Ct. 1375, 1379 (2000) (acknowledging that "[o]ur decisions recognize the serious threat that armed criminals pose to public safety" while declining to modify the standard for a *Terry* stop for illegal gun possession); *Rodriguez v. United States*, 575 U.S. 348, 356, 135 S. Ct. 1609, 1616 (2015) (noting that "the government's officer safety interest stems from the mission of the stop itself" (internal quotation marks omitted)); *Darrell*, 945 F.3d at 936 (considering that "retreat may be a tactical strategy for an armed suspect who wishes to

No. 21-40091

and based on his experience dealing with gang members, he reasonably believed that Alvarez matched the description of a wanted criminal who was evading law enforcement in a high crime area where he had previously been seen.  Without acknowledging the heightened risk, the majority faults Officer Deleon for conducting an investigatory stop to dispel his suspicion that this man was wanted and dangerous rather than just letting him flee.[13] *Adams*, 407 U.S. at 146, 92 S. Ct. at 1923 ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."); *Glover*, 140 S. Ct. at 1189–90 (officers may use principles of common sense to make inferences supporting suspicion).

---

harm the police" when holding that a stop was justified); *McKinney*, 980 F.3d at 495 (considering whether the "officers . . . fear[ed] for their safety" before holding that there was no reasonable suspicion for the stop).  *See also Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty.*, 542 U.S. 177, 197, 124 S. Ct. 2451, 2465 (2004) (Breyer, J., dissenting) ("At the same time, it recognized that in certain circumstances, public safety might require a limited 'seizure,' or stop, of an individual against his will.").

[13] The Supreme Court has characterized the search for wanted criminals as a "strong government interest."

> [W]here police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice . . . . Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible.  The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes.

*Hensley*, 469 U.S. at 229, 105 S. Ct. at 680.

No. 21-40091

Finally, and gratuitously, the majority *sua sponte* concludes that the descriptive information provided to Officer Deleon and his partner via the "roundup" packets could not contribute to reasonable suspicion because the government did not establish that any prior suspicion "vested" via the collective knowledge doctrine.  The majority's gratuitous ruling is useless dicta.  The government hardly broached, and in fact, disclaimed its reliance on this doctrine, and Alvarez never raised this argument in the district court or on appeal.[14]  In fact, if Alvarez had raised this argument on appeal, we would likely deem it forfeited.  *See Martinez v. Texas Dep't of Crim. Just.*, 300 F.3d 567, 573 (5th Cir. 2002).  Yet, this discourse illustrates the majority's tendency to view the record before us in the light *least* favorable to the government.

For the foregoing reasons, I respectfully dissent.

---

[14] The government briefly acknowledges the collective knowledge doctrine in passing, but importantly, Alvarez does not.  Furthermore, the district court never considered the collective knowledge doctrine because the theory was never presented below.  *United States v. Alvarez*, No. 2:20-CR-41, 2020 WL 5984078, at *2 (S.D. Tex. Oct. 8, 2020).  The majority asserts that the district court "relied, in part," on the collective knowledge doctrine, but the *only* mention of "collective knowledge" in the district court's opinion is within its articulation of the standard for reasonable suspicion.  Specifically, it innocuously noted that "a court must look to the 'totality of the circumstances and *the collective knowledge and experience* of the officer or officers.'"  *Id.* (citing *United States v. Estrada*, 459 F.3d 627, 631–32 (5th Cir. 2006)) (emphasis added).  (*Estrada* was also not about the collective knowledge doctrine.)  That is *the full extent* of the district court's consideration of the matter.